DIXON DISTRIBUTING COMPANY, Plaintiff-Appellant, v. HANOVER INSURANCE COMPANY et al., Defendants-Appellees.

Fifth District No. 5—92—0071

Opinion filed April 12, 1993.—Rehearing denied May 17, 1993.

John Dale Stobbs and James S. Sinclair, both of Stobbs & Sinclair, of Alton, for appellant.

Jeffrey S. Hebrank, of Burroughs, Simpson, Hepler, Broom & Mac-Donald, of Edwardsville, for appellee International Insurance Company.

John H. Marshall, of Burns, Marshall, Burns & Hobbs, of Clayton, Missouri, for appellees Hanover Insurance Company and Massachusetts Bay Insurance Company.

No brief filed for appellee Patrick Hanneken.

JUSTICE LEWIS delivered the opinion of the court:

"Judges ought to remember that their office is *jus dicere*, and not *jus dare*; to interpret law, and not to make law, or give law."[1]

This appeal is from a summary judgment entered in favor of the defendants, Hanover Insurance Company (Hanover), Massachusetts Bay Insurance Company (Massachusetts), and International Insurance Company (International), in a declaratory judgment action brought by Dixon Distributing Company (Dixon). For reasons set forth below, we affirm in part, reverse in part, and remand.

On October 7, 1985, Patrick Hanneken filed a retaliatory discharge action against Dixon, alleging that he had sustained two work-related injuries while employed by Dixon, both of which were resolved in accordance with the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*). Hanneken further alleged in his complaint that Dixon's president, Robert L. Dixon, who was also a named defendant, "exhibited bias and prejudice against [Hanneken] in the exercise of his rights as an employee under the Worker's Compensation Act," and that his termination from employment was a willful, intentional, and wrongful act in violation of section 4(h) of the Workers' Compensation Act. (Ill. Rev. Stat. 1985, ch. 48, par. 138.4(h).) Hanneken's prayer for relief requested reinstatement in a "suitable position" and compensatory and punitive damages.

Dixon requested each of the defendant insurance companies to defend the suit under a package of comprehensive business insurance policies that Dixon had purchased simultaneously from defendants. Each policy required the insurance companies to defend lawsuits against the insured even if the suits were groundless, false, or fraudulent, so long as the terms of the policy covered the facts alleged in the complaints. Hanover initially defended under a reservation of rights but later withdrew and discontinued all defense of Dixon. International and Massachusetts refused to defend altogether.

On August 23, 1988, Dixon filed a complaint seeking a declaratory judgment against the insurance companies. After discovery was conducted in the underlying retaliatory discharge case, Hanneken filed an amended complaint, alleging that "the discharge from and refusal to rehire Plaintiff to his employment by [Dixon] was intentional and in retaliation of and solely for the exercise of [Hanneken's] rights under the Illinois Worker's Compensation Act in violation of the *** public

---

[1] Francis Bacon, "Of Judicature."

policy of the State of Illinois," again requesting reinstatement and compensatory and punitive damages.

The trial court, in the declaratory judgment case, ruled in favor of the insurance companies on the parties' cross-motions for summary judgment, stating in its order of March 8, 1991: "It has become apparent to this Court that there can be no insurance coverage for the damages involved in a retaliatory discharge case." The court based its decision primarily on the Seventh Circuit case of *United States Fire Insurance Co. v. Beltmann North American Co.* (7th Cir. 1989), 883 F.2d 564. On January 23, 1992, the trial court entered a revised order of judgment making the Dixon case appealable, since the underlying retaliatory discharge case was dismissed pursuant to a settlement on November 22, 1991.

The appeal of the grant of summary judgment to the defendants in this case requires this court, on review, to inquire whether the pleadings, together with all other matters of record, pose any genuine issue of material fact. If any issue of material fact exists, then the trial court erred in its grant of summary judgment. (*Joiner v. Benton Community Bank* (1980), 82 Ill. 2d 40, 411 N.E.2d 229.) This appeal, therefore, initially raises the issue of whether any of the insurance policies issued by defendants provided any possibility of coverage to Dixon for the underlying retaliatory discharge action. See *J G Industries, Inc. v. National Union Fire Insurance Co.* (1991), 218 Ill. App. 3d 1061, 578 N.E.2d 1259 (a case where the insurance policy did not cover the tort of retaliatory discharge).

■ Our analysis of this issue first requires an overview of the law concerning insurance coverage generally. "To determine whether the insurer has a duty to defend the insured, the court must look to the allegations in the underlying complaint and compare these allegations to the relevant provisions of the insurance policy." (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 107-08.) It has long been established that if the complaint against the insured alleges claims even potentially within the policy's coverage, the insurer must either defend under a reservation of rights or seek a declaration of rights via a declaratory judgment action. (*Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953.) If there is any possibility of coverage, the insurer must defend even if the allegations of the underlying complaint prove to be false, groundless, or fraudulent. The insurance company cannot justifiably refuse to defend unless it is *clear* from the face of the complaint that there is no possibility of coverage. *United States Fidelity*

*& Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926.

The duty to defend arises from the undertaking as stated in the policy. (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 442 N.E.2d 245.) In order to determine if there is a duty to defend any particular lawsuit, the underlying complaint and the insurance policy will be construed liberally in favor of the insured, and all doubts and ambiguities must be resolved in favor of the insured. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926.

■ With the foregoing principles in mind, we must consider whether there is any possibility of coverage under any of the insurance policies issued by defendants. Although Hanover and Massachusetts filed a joint brief herein, it is clear that neither of their policies include any possibility of coverage. This fact is made crystal clear from Dixon's brief, since Dixon does not argue that Hanover or Massachusetts has a duty to defend the retaliatory discharge action. Therefore, as to Hanover and Massachusetts, the grant of summary judgment by the trial court was proper. As a result, we will not discuss the policy language of any policy except that issued by International.

■ International admits that its policy is what is commonly referred to as an "umbrella policy." An umbrella policy is recognized to provide unique and special coverage. It is often aptly called "catastrophe" insurance. Umbrella or catastrophe insurance has been defined as:

> " '[A] needed form of coverage which picks up, above the limits of all other contracts, such as automobile and homeowners coverages, to give the security and peace of mind so necessary today where jury verdicts, or court awards, may be very substantial, to discharge the unexpected, but potentially bankrupting, judgment.
>
> The courts are not ignorant of [the] desirable socio-economic consequences attendant upon the providing of umbrella or catastrophe coverages.' " *Illinois Emcasco Insurance Co. v. Continental Casualty Co.* (1985), 139 Ill. App. 3d 130, 133, 487 N.E.2d 110, 112, quoting from 8A J. Appleman & J. Appleman, Insurance Law & Practice §4906, at 348, §4909.85, at 452 (1981).

While International's policy is an umbrella policy, under certain circumstances, the policy acts as primary insurance, where there is coverage under the International policy but not under any other regu-

lar primary policy issued to Dixon. International argues, however, that there is no possibility of coverage under its policy for the retaliatory discharge action instituted against the insured because of the definition of "occurrence" contained in the policy.

International's policy provides in pertinent part as follows:

"I. Coverage

The Company (International) agrees to pay on behalf of the insured the ultimate net loss *** which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the insured under contract, for:

(a) Bodily Injury Liability,

(b) Personal Injury Liability,

(c) Property Damage Liability, or

(d) Advertising Liability

arising out of an occurrence.

II. Defense Settlement

With respect to any occurrence covered by the terms and conditions of this policy, but not covered *** by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured, the company shall:

(a) Defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

The policy defines personal injury as "injury, such as but not limited to libel, slander, defamation of character, discrimination, false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation which occurs during the policy sustained by a natural person." Occurrence, with respect to personal injury, is defined as "an offense which results in personal injury, other than an offense committed with actual malice or the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured." The policy does not define "actual malice," nor does it specifically exclude retaliatory discharge anywhere in the policy, even though there is an entire section entitled "Exclusions." Neither the exclusions section nor any other section of the policy includes any exclusion for personal injury liability other than those listed in the definition of occurrence.

Dixon argues that the tort of retaliatory discharge falls under the personal injury definition, since it is a tort that is similar to the listed

torts, and since the definition is not restricted but uses the open-ended phrase "such as but not limited to." Dixon further argues that retaliatory discharge is not a tort requiring "actual malice" for its proof and that it is not committed in "willful violation of a penal statute or ordinance by or with the knowledge or consent of the insured."

International, on the other hand, argues that the definition of occurrence in the policy excludes coverage for the tort of retaliatory discharge because retaliatory discharge is an offense committed with actual malice. International does not argue that retaliatory discharge is a "willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured." Therefore, we will not consider that part of the exclusion in our analysis. International urges this court to accept the reasoning of *United States Fire Insurance Co. v. Beltmann North American Co.* (7th Cir. 1989), 883 F.2d 564, as the lower court did.

In *Beltmann*, the Seventh Circuit Court of Appeals construed an insurance policy which defines personal injury and occurrence the same as in the International policy issued to Dixon. *Beltmann* also involved an underlying lawsuit against the insured for retaliatory discharge, which was on appeal after judgment had been entered in favor of the employee, contrary to the case *sub judice*, where the underlying lawsuit for retaliatory discharge had been settled. The issue in both cases is whether the policy excluded any obligation of the insurance company to defend a *claim* of retaliatory discharge against the insured. (*Beltmann* treated the issue in its case as a claim of retaliatory discharge and not as a fact that had been proven, even though a jury had returned a verdict, which included punitive damages, against the insured employer.)

Because *Beltmann* was a diversity action, Minnesota law governed the court's construction of the term "actual malice." The court next looked to Illinois law to determine what elements are necessary to prove a charge of retaliatory discharge, in order to decide the ultimate question of whether the tort of retaliatory discharge is an offense committed with actual malice in every case.

*Beltmann* first came to the following conclusion from Minnesota law:

> "Both actual and simple malice require that the defendant acted intentionally with knowledge that her conduct was wrongful. Actual malice entails the further component of an intent on the part of the defendant to injure the plaintiff by the wrongful act, or an affirmative conscious and intentional disregard of the specific consequences which are certain to injure

the plaintiff as a result of the wrongful act." (*Beltmann*, 883 F.2d at 568.)

Then the court reviewed Illinois law as to the elements to be proved for a claim of retaliatory discharge, which are (1) the employee was discharged; (2) the discharge was in retaliation for the employee's activities; and (3) the discharge violated a clear mandate of public policy. (*Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, 529, 519 N.E.2d 909, 911.) Actual malice, if it existed, had to be contained in the second element, which requires retaliation for the employee's activities. The court then held that the discharge of an employee manifests an intent to harm the employee. An intent to harm an employee that violates public policy, so the reasoning goes, is done with actual malice.

The *Beltmann* court further reasoned that, under Illinois law, once a plaintiff has proven that his discharge was in retaliation for exercising a protected right, then he has *de facto* proved actual malice.

> "[R]etaliatory discharge carries with it a charge of actual malice subsumed within the elements of [the] claim. While [the plaintiff] may not have had to prove actual malice as an independent factor, he nonetheless has proved it by satisfying the formal elements of the tort of retaliatory discharge. If he had been unable to show actual malice, his claim for retaliatory discharge would have failed for failure to prove that the discharge was retaliatory in nature." (*Beltmann*, 883 F.2d at 569.)

Therefore, "[s]ince actual malice is a necessary component of [the employee's] claim, and because the insurance policy specifically excludes coverage for personal injuries arising from offenses committed with actual malice, [the employee's] claim is not a covered claim." (*Beltmann*, 883 F.2d at 569.) Thus, we are left with a holding that basically says that no matter what the facts may be, if the employee claims or alleges retaliatory discharge in the complaint, the umbrella insurance policy does not cover this claim.

*Beltmann* is not binding on this court, as decisions of the United States district courts and circuit courts of appeal are not binding upon Illinois courts. This court is free to consider the issues of this case independent of *Beltmann*. (*City of Chicago v. Groffman* (1977), 68 Ill. 2d 112, 368 N.E.2d 891.) For reasons more fully set forth below, we respectfully disagree with the *Beltmann* court and the trial court in this case that the umbrella policy in question automatically excludes coverage for a retaliatory discharge suit.

We first need to review briefly the history of the tort of retaliatory discharge in Illinois. The Illinois Supreme Court, in the case of *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353, first recognized the tort of retaliatory discharge as an exception to the general rule that an employer may fire an at-will employee at any time for any reason or no reason. The foundation for this tort is stated clearly by the supreme court in *Kelsay*. "[A]n employer's otherwise absolute power to terminate an employee at will should [not] prevail when that power is exercised to prevent the employee from asserting his statutory rights." *Kelsay*, 74 Ill. 2d at 181, 384 N.E.2d at 357.

In 1981, the supreme court again considered the reasoning behind the tort. "[I]t is now recognized that a proper balance must be maintained among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 129, 421 N.E.2d 876, 878.) The *Palmateer* court described the elements of the offense of retaliatory discharge succinctly. "All that is required is that the employer discharge the employee in retaliation for the employee's activities, and that the discharge be in contravention of a clearly mandated public policy." *Palmateer*, 85 Ill. 2d at 134, 421 N.E.2d at 881.

We have already set forth the elements necessary to state a valid claim for a retaliatory discharge as stated in *Hinthorn*. We need to further caution that the causality element requires more than a discharge in connection with filing a workers' compensation claim. (*Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 562 N.E.2d 282.) In other words, an employer cannot be held liable for a retaliatory discharge solely because the employer fired an employee who at one time or another filed a workers' compensation claim. It must be affirmatively shown to the trier of fact that the discharge was primarily to retaliate against the employee for exercising the protected right and not for a lawful business reason. (*Hartlein v. Illinois Power Co.* (1992), 151 Ill. 2d 142, 160, 601 N.E.2d 720, 728.) The critical issue is the employer's intent. *Miller v. J.M. Jones Co.* (1992), 225 Ill. App. 3d 799, 587 N.E.2d 654.

We note that nowhere in any case cited by any of the parties, nor in any case cited by the seventh circuit in *Beltmann*, is there any mention of malice, actual or otherwise, in a retaliatory discharge case. Nowhere is there any legislative history cited that shows that the legislature even discussed requiring a showing, an implication, a presumption, or an inference of malice in a retaliatory discharge action

under the Workers' Compensation Act. Regardless of the wishes of International, the courts should not take words from an insurance policy and legislate those words into an element of existing law. The law should come from statutes duly passed by our legislature or from legal precedents set by our courts, and not from insurance policies.

We reluctantly feel compelled to enter the morass of examining the phrase "actual malice" only because *Beltmann* forces us to consider whether actual malice is a component of the tort of retaliatory discharge. The first source to use in seeking a plain and ordinary meaning for a word contained in an insurance policy is the dictionary, since many insureds are not lawyers nor would they have a law library available to assist them. *Beltmann* used Minnesota case law for its source. Webster provides a better definition of "malice" in saying it is: "(1) active ill will; desire to harm another or to do mischief; spite (2) *Law* evil intent; state of mind shown by intention to do, or intentional doing of, something unlawful." Webster's New World Dictionary 818 (3d College ed. 1988).

After looking at the definition of malice, we find ourselves in a situation similar to Justice Potter Stewart when he was attempting to define pornography. We may not be able to define malice, but we know it when we see it. (See *Jacobellis v. Ohio* (1964), 378 U.S. 184, 197, 12 L. Ed. 2d 793, 804, 84 S. Ct. 1676, 1683 (Stewart, J., concurring).) Malice has to mean more than intent to do harm by a wrongful act, or in the words of *Beltmann,* it has to mean more than "an affirmative conscious and intentional disregard of the specific consequences which are certain to injure the plaintiff as a result of the wrongful act." (*Beltmann,* 883 F.2d at 568.) An act must have some degree of evil intent, ill will, or spite before it can be said to be a malicious act.

The *Beltmann* court concentrated on the word "malice," instead of the word "actual." "Actual" is defined by Black as "[r]eal; substantial; existing presently in act; having a valid objective existence as opposed to that which is merely theoretical or possible." (Black's Law Dictionary 33 (5th ed. 1979).) Thus, if there is malice or an evil intent, it must really exist in order for it to be actual malice. Malice cannot be implied or presumed and still be actual.

There may have been actual malice in the *Beltmann* case, as the jury found that the employer fired the employee in retaliation for the employee refusing to assist the employer in defrauding the State of Illinois. That does not mean that because the facts in *Beltmann* may show actual malice, actual malice exists in every retaliatory discharge case.

*Beltmann* used the example of a mugger in order to show actual malice. The argument is that the mugger's primary goal may be to increase his wealth and not necessarily to harm the victim, but *Beltmann* still said that the mugger has malice. This certainly appears to be implied malice and not actual malice. Further, we would not necessarily find malice in every mugging, or what is known in Illinois as robbery. (Ill. Rev. Stat. 1991, ch. 38, par. 18—1 (now 720 ILCS 5/18—1 (West 1992)).) We further note that the Criminal Code of 1961 eliminated the difficulty of dealing with malice as a criminal act and mental state in criminal cases. (Ill. Rev. Stat. 1991, ch. 38, par. 4—3 *et seq.* (now 720 ILCS 5/4—3 *et seq.* (West 1992)).) Several examples immediately come to mind: Robin Hood, or a desperate parent who thinks that there is only one way to obtain money to feed his children, or a person who takes the car keys away from his drunken friend by force; these are all examples where a person may technically commit a robbery or a mugging but might not be guilty of having an evil intent.

Prior to the creation of the tort of retaliatory discharge, firing an employee for any reason was not considered evil under the law of this capitalistic society. In fact, firing an employee for the purpose of cutting costs or to become more efficient by removing a continually injured or accident-prone employee, thereby maximizing profits, was considered to be a good business practice. *Beltmann* now wants us to subsume, infer, imply, or presume that the employer has actual malice in performing what was and might still be considered by many (except for the penalties involved for a retaliatory discharge) a good business practice.

Our supreme court recognized in *Palmateer* that a proper balance must be maintained among the employer's interest in operating a business efficiently and profitably and the employee's interest in earning a livelihood. (*Palmateer*, 85 Ill. 2d at 129, 421 N.E.2d at 878.) The supreme court never indicated that firing an employee in order to cut the cost of workers' compensation was something inherently evil on the part of the employer. Rather, the court and the legislature recognized that the employee's and society's interest outweighed the employer's interest in that situation.

*Beltmann* does not recognize that in this day and age the employer may even sincerely wish the discharged employee good fortune. No employer wants to pay unemployment compensation, so the employer sincerely hopes that the employee will find new employment quickly. The employer also may not have any ill feeling toward the employee; the employer just wants the often-injured employee out of

the way because of the problems caused by replacing the employee with an untrained part-time employee. The employer may not even be thinking about the harm to the employee, because of the availability of jobs and the many safeguards that our society has provided for the unemployed. Many persons in government and the business world feel compelled to take certain steps that may hurt employees but are done to help the government or the company. For instance, if Congress enacted a law making it illegal to fire striking workers, would we now say in hindsight that President Ronald Reagan acted in the early 1980's with actual malice or an evil intent in firing the striking air controllers? What *Beltmann* did was to imply malice in situations where no malice actually exists.

*Beltmann* raised the fear that an "[employer] could always escape a finding of actual malice no matter what was alleged by contending that his actions were not taken to hurt the [employee], but were instead intended only to please or advance the [employer's] own interest." (*Beltmann*, 883 F.2d at 569.) There are, however, two problems with that reasoning. First, if actual malice is not an element of the tort of retaliatory discharge, then we do not have to worry about an employer escaping a finding of actual malice, because the employee would not have to prove such. *Beltmann*'s fear becomes self-fulfilling, because by making actual malice an element of the tort, employers' excuses for firing the employees mitigate against the existence of malice. Most employers will have real or created reasons for firing employees, so that employees might find themselves with a tremendous burden of having to prove the nonexistence of the employers' excuses, if the employee hopes to convince the trier of fact that the employer had actual malice toward the employee. It becomes more difficult for an employee to overcome the subjective proof by an employer that the employee was slothful, insubordinate, or had poor work attendance, if proof of malice is required. Even if the employee was fired for asserting his worker's rights under the law, the employer will argue it was not done out of malice; rather, it was a culmination of problems caused by the employee. Secondly, there does not seem to be any problem in Illinois with employers escaping liability in retaliatory discharge cases even when the employers contend that they had other reasons to fire the employees. See *Wieseman v. Kienstra, Inc.* (1992), 237 Ill. App. 3d 721, 731-33, 604 N.E.2d 1126, 1133-35 (Chapman, J., dissenting) (includes a list of all the retaliatory discharge cases in Illinois, the vast majority of which according to Justice Chapman found in favor of the employee).

■ Therefore, if we apply the above analysis and the plain and ordinary dictionary meaning to the phrase "actual malice," we do not believe that we are forced to logically infer "actual malice" from the elements of retaliatory discharge, as *Beltmann* and *International* would have us do. No authority other than *Beltmann* has been postulated for such a construction, and we decline to accept the reasoning of *Beltmann*. Of course, it is possible for employees in some retaliatory discharge cases or insurance companies with insurance policies similar to the policy in this case to prove actual malice by employers against the employees. But the simple fact that actual malice can be proven in a given factual context does not amount to a general rule that, as a matter of law, it exists in every retaliatory discharge claim or case. Because actual malice is not an element of retaliatory discharge, International cannot rely on its definition of occurrence to exclude coverage to Dixon.

Next, we cannot help but notice that the 10 intentional torts listed as being covered in the policy may all be worse than a retaliatory discharge. *Beltmann* held, in its narrowest definition, that the tort of retaliatory discharge implies a wrongful act with intent to do harm. Libel, slander, malicious prosecution, false arrest, false imprisonment, defamation of character, wrongful eviction, discrimination, wrongful detention, and humiliation all could imply a wrongful act with intent to do harm. Why should the actual malice exclusion not apply to these intentional torts? In fact, an element that must be proven in the tort of malicious prosecution is the presence of malice. *Mack v. First Security Bank* (1987), 158 Ill. App. 3d 497, 511 N.E.2d 714.

If the actual malice exclusion did apply to these 10 listed torts, then the policy would not make any sense. It would amount to giving coverage in one sentence and taking away the same coverage in a later sentence, in the same definition section of the policy. The coverage of the 10 listed torts would be superfluous.

We have already cited *Wilkin* for the well-known rule of law that all doubts and ambiguities in an insurance policy must be resolved in favor of the insured. (*United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926.) It is also Illinois law "that if an insurance contract contains inconsistent or conflicting clauses, the clause which affords greater or more inclusive benefit for the insured will govern." (*Standard Mutual Insurance Co. v. General Casualty Cos.* (1988), 171 Ill. App. 3d 758, 764, 525 N.E.2d 965, 969.) Thus, if there is any doubt about whether the tort of retaliatory discharge is covered, then it should be resolved in favor of Dixon.

We note also that construing the definition section of the insurance policy that sets out "injury, such as but not limited to [the 10 torts]" as being superfluous may cause a violation of section 143 of the Illinois Insurance Code (Ill. Rev. Stat. 1991, ch. 73, par. 755(2) (now 215 ILCS 5/143 (West 1992))). The Director of Insurance is to withhold approval of the policy if it "contains inconsistent, ambiguous or misleading clauses, or contains exceptions and conditions that will unreasonably or deceptively affect the risks that are purported to be assumed by the policy." (Ill. Rev. Stat. 1991, ch. 73, par. 755(2) (now 215 ILCS 5/143 (West 1992)).) Dixon had the right to assume, under its umbrella policy specifically listing the 10 torts and any other similar tort, that the policy would cover the tort of retaliatory discharge.

Further, it is an improper claims practice for an insurance company to "[k]nowingly [misrepresent] to *** insureds relevant facts or policy provisions relat[ed] to coverage at issue." (Ill. Rev. Stat. 1991, ch. 73, par. 766.6(a) (now 215 ILCS 5/154.6 (West 1992)).) If International's insurance policy excludes coverage for any intentional tort, then the insurance contract could be considered a fraud and International could be liable under various statutes and common law theories prohibiting such fraudulent commercial activity. See Ill. Rev. Stat. 1991, ch. 121½, par. 261 et seq. (now 815 ILCS 505/1 et seq. (West 1992)) (Consumer Fraud and Deceptive Business Practices Act).

We next consider International's argument that public policy mandates against insurance coverage for the tort of retaliatory discharge. International bases this argument on *Rubenstein Lumber Co. v. Aetna Life & Casualty Co.* (1984), 122 Ill. App. 3d 717, 462 N.E.2d 660.

In *Rubenstein*, the fourth district considered whether an insurance policy covers a retaliatory discharge case filed against the insured. *Rubenstein* found that the policy in question required the insurance company to " 'pay promptly when due all compensation and other benefits required of the Insured by the workmen's compensation law' and to 'defend any proceeding against the Insured seeking such benefits ***.' " (*Rubenstein*, 122 Ill. App. 3d at 718, 462 N.E.2d at 661.) Because damages assessed in a retaliatory discharge case are not benefits required by the workers' compensation law, the court held that the policy did not require the insurance company to defend or indemnify the insured. The court went on, in pure *dicta*, to say: "[E]ven if the policy was written to expressly require the defendant to defend and indemnify plaintiff in the retaliatory discharge action, we believe that such a provision would be void as against public policy, for it would be an attempt to indemnify and insure the company for damages resulting from its voluntary misconduct." (*Rubenstein*,

122 Ill. App. 3d at 719, 462 N.E.2d at 662.) The court further stated: "An agreement to indemnify or insure against one's voluntary, not accidental, misconduct is against public policy and unenforceable." *Rubenstein*, 122 Ill. App. 3d at 719, 462 N.E.2d at 662, citing *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 500-01, 336 N.E.2d 881, 885.

There are two reasons why the *dicta* in *Rubenstein* do not control or persuade in this case. First, the facts of the case are not similar to the case *sub judice*. There, the court construed a policy providing a defense and indemnification for workers' compensation benefits. International's policy does not contain language even remotely similar, and it does not purport to cover workers' compensation claims. Therefore, the rule set forth in *Rubenstein* has no application to the issues we face. Second, for this court to rely on *dicta* which are superfluous to the rule of the case, the *dicta* must rest upon sound law which applies to the facts of the case this court considers today. The public policy *dicta* set forth in *Rubenstein* are not based upon sound law. In fact, the case cited for the proposition that public policy mandates against insurance for voluntary misconduct does not stand for such a proposition. *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881.

In *Davis*, the supreme court construed a particular section of the Structural Work Act prohibiting a "covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence" as being against public policy. (Ill. Rev. Stat. 1971, ch. 29, par. 61.) Initially, then, it is clear that *Davis* cannot control the outcome of this case because the facts are dissimilar. The case *sub judice* does not deal with the Structural Work Act or a covenant, promise, or agreement to indemnify or hold harmless an employer guilty of willful misconduct. In fact, the insurance policy issued by International specifically excludes coverage for any injury "committed with actual malice or the willful violation of a penal statute or ordinance committed with the knowledge or consent of the insured." However, we will analyze the case since the rule it establishes and its rationale contradict International's argument.

*Davis* concerned an equal protection argument against the pertinent section of the Structural Work Act. (*Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881.) Although the court stated that an agreement to indemnify against willful misconduct would, as a general rule, be contrary to public policy (*Davis*, 61 Ill. 2d at 500-01, 336 N.E.2d at 885), the court determined that a statute allowing indemnity in the form of construction bonds or insurance con-

tracts in structural work cases was not an arbitrary and irrational exception to the prohibition against indemnity for willful misconduct. *Davis*, 61 Ill. 2d at 503, 336 N.E.2d at 886.

Indeed, the courts have allowed insurance to indemnify many categories of willful misconduct. See *Scott v. Instant Parking, Inc.* (1969), 105 Ill. App. 2d 133, 245 N.E.2d 124 (insurance for willful misconduct of agents and servants); *Warren v. Lemay* (1986), 144 Ill. App. 3d 107, 494 N.E.2d 206 (insurance for vicarious liability for punitive damages); *Interco Inc. v. Mission Insurance Co.* (8th Cir. 1987), 808 F.2d 682 (insurance company required to defend claim of wrongful termination under Missouri law).

We probably do not even have to reach the public policy question since the insurance policy issued by International by its very terms disposes of any problem or conflict with public policy. The insurance policy itself can be construed to prohibit coverage or indemnification, if the employer acted with actual malice or with a willful violation of the law. It is an issue of fact and not a public policy issue.

■ International makes a broader argument, however, that public policy excludes coverage for a claim of retaliatory discharge. Public policy should not and does not exclude coverage of the cost of defending against groundless, false, or fraudulent claims against an innocent employer. International's argument that public policy prohibits insuring against all claims for retaliatory discharge presumes that all employers are guilty. Surely the public policy of this State is not so antibusiness that employers are not even allowed to protect their businesses from the high cost of litigation, merely because an employee claims that some right has been violated.

International does not and cannot cite any statute or legislative directive in Illinois that prohibits insurance indemnification for any kind of intentional tort. "The public policy of the state is to be found in its constitution and statutes, and, where these are silent, in its judicial decisions." (*Davis*, 61 Ill. 2d at 497, 336 N.E.2d at 883.) The courts, however, should be very cautious in establishing public policy by court fiat. Courts are ill equipped to determine what the public policy should be. Seldom are all interested parties, all facts, and all issues present in a single case, where the court can rationally balance all the factors necessary to establish a policy good for society. Further, establishing public policy may entail the balancing of political interests. This is a function of the legislature, not the courts.

If we were to broadly decide that public policy prohibits employers from obtaining insurance coverage for willful violations of statutes, this reasoning and ruling could be applied to other suits in which

plaintiffs assert willful violations of laws by businesses. It may be more in the public's interest to allow businesses to protect themselves by insurance coverage against all the various forms of claims for discrimination, sexual harassment, and retaliatory discharge than to allow businesses to become bankrupt in defending against several catastrophic suits. After all, the wronged plaintiff, the community, and society in general are not helped if the plaintiff cannot recover his damages or job, and if numerous employees are thrown out of work.

The public policy behind retaliatory discharge law is to protect employees from losing their jobs when they assert their rights. If insurance coverage somehow insulated employers from liability and thereby made them more likely to fire employees in retaliation for asserting protected rights, then the public policy may favor a restriction of insurance on that basis. However, International has not shown how insurance would so insulate employers. On the contrary, the free market may work against insulating employers from liability. Insurance companies have the right to refuse to insure or to increase their premiums, both of which may act as deterrents against retaliatory discharges by impetuous employers. We decline to assume that insured employers would be more inclined to fire employees for asserting protected rights without facts to support it.

The tort of retaliatory discharge is designed to achieve a balance between the needs of the employer, the needs of the employee, and the needs of society. The employer must be allowed to conduct his business in a profitable and efficient manner. The employee needs to make a suitable living. Society needs to protect workers from undue abuse. (See *Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 568 N.E.2d 870.) Broadly prohibiting insurance for retaliatory discharge will not serve the needs of the employer, the employee, or society. Insurance coverage may actually help to achieve the delicate balance between the three interests if it compensates the employee for a retaliatory discharge judgment without bankrupting the company. Having a third party, with an economic interest to protect, oversee the actions of the employer could be very beneficial to the employee and society. We, therefore, hold that the public policy of the State of Illinois does not prohibit insurance coverage against claims of retaliatory discharge.

■■ Based upon the reasons stated herein, we hold that the insurance policy issued by International to Dixon at least potentially covers the tort of retaliatory discharge and that this potential coverage does not violate the public policy of this State. As a result, when International refused to defend Dixon against the underlying retaliatory dis-

charge case, it breached its duty to defend as stated in the policy. Therefore, the case is reversed as to International and remanded to the circuit court. We make no comment as to whether the underlying retaliatory discharge case included any showing of actual malice, since that record is not before us. Any question of Dixon's intent in firing the employee was a question of fact that should have been ascertained by the trier of fact. For the reasons previously stated, we affirm the trial court's grant of summary judgment to Hanover and Massachusetts but reverse the court's grant of summary judgment to International. We remand this cause to the trial court for further proceedings in accordance with this opinion.

Affirmed in part; reversed in part and remanded.

WELCH and GOLDENHERSH, JJ., concur.