Michael HIATT, Plaintiff–Appellee,

v.

ROCKWELL INTERNATIONAL
CORPORATION, Defendant–
Appellant.

No. 93–2300.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1993.

Decided June 14, 1994.

Jerome E. McDonald (argued), Campbell, Black, Carnine & Hedin, Mt. Vernon, IL, for plaintiff-appellee.

Bruce R. Alper (argued), Richard A. Saldinger, Vedder, Price, Kaufman & Kammholz, Chicago, IL, Curtis Calloway, John J. Moellering, Lewis, Rice & Fingersh, St. Louis, MO, for defendant-appellant.

Before MANION and KANNE, Circuit Judges, and WILL, District Judge.*

MANION, Circuit Judge.

In this diversity action, Michael Hiatt ("Hiatt") sued his former employer, Rockwell International Corporation ("Rockwell" or "the company"), for retaliatory discharge. He claimed that Rockwell discharged him for pursuing his rights under the Illinois Workers' Compensation Act ("the Act"), 820 ILCS 305/1 *et seq.* (1993). The jury returned a verdict in favor of Hiatt, awarding him $36,-188.00 in compensatory damages and $413,-812.00 in punitive damages.

On appeal, Rockwell argues, among other things, that the district court erred in refus-

* Hon. Hubert L. Will, Judge for the Northern District of Illinois, is sitting by designation.

ing to grant its motion for judgment notwithstanding the verdict ("j.n.o.v.") and that, in any event, the award of punitive damages was not supported by an additional showing of malice and willfulness necessary to sustain punitive damages under Illinois law. We agree on both counts and therefore reverse.

## I. Background

Rockwell operates a plant in Centralia, Illinois that manufactures fiberglass truck and automobile parts. Production employees in that facility are represented by the United Auto Workers ("the union") which has various collective bargaining agreements with the company. Hiatt began working at Rockwell's Centralia plant on January 25, 1984. He held a succession of production positions during his employment and was covered under the union agreements. Hiatt was terminated by the company in October of 1989.

During the course of his employment Hiatt sustained two injuries to his left knee and developed carpal tunnel syndrome. His first knee injury occurred sometime in 1984 for which he sought and received workers' compensation benefits. He then filed a subsequent claim under workers' compensation for his carpal tunnel syndrome. Rockwell contested this claim, but eventually settled with Hiatt after he was fired. The third claim for workers' compensation arose in October, 1987, when Hiatt re-injured his left knee. The company did not contest this claim at first, but later denied it when Hiatt failed to provide the appropriate medical documentation. The company offered to cover this third injury under its sickness and accident program. Hiatt refused, stating that he was entitled to workers' compensation for this injury. The record indicates that Hiatt took two and a half months medical leave for his first knee injury and took almost a year off for the second knee injury.

After Hiatt had been off work for most of 1988, Hiatt's supervisor, Frank Francyzk, placed Hiatt under surveillance. Francyzk testified that when an employee has been off work for eight months to a year, it is the company's belief that the employee could return to work. He testified that the company occasionally investigates the daily activities of such employees, and that this is done with probably one to three employees per year.[1]

Hiatt returned to work in November of 1988. His knee injury, however, prevented him from returning to his previous assembler job and so the company assigned him to drive a sweeper. That job also proved too hard on his knee and he again went on medical leave. When he was authorized by his doctor to return to work on March 3, 1989, the company provided Hiatt with a series of alternate light duty assignments within the plant. Although he often asked Francyzk about a permanent light duty position that fit his medical restrictions, no such position was available. Hiatt worked without additional medical problems until his termination in October, 1989.

The facts surrounding Hiatt's termination revolve around a provision in one of the collective bargaining agreements between the company and the union. Each contract year employees at the Centralia plant are entitled to a certain level of reimbursement from Rockwell for one pair of safety shoes. To obtain reimbursement, employees must show proof of purchase by either submitting a receipt or bringing in the shoe box. Hiatt had used this procedure many times during his tenure at Rockwell and employed it twice in 1989, once in June and then again in October (representing two different contract years). The events surrounding the October reimbursement gave rise to Hiatt's termination.

On October 20, 1989, Hiatt presented a receipt to Rockwell nurse Pat Thompson who handled shoe reimbursements. Several days later, when Thompson was completing some paperwork, she reviewed Hiatt's reimbursement claim. She testified that the receipt appeared to have been written over and was thin in parts. She became suspicious that the receipt had been altered or falsified and

---

1. The record also indicates that Metropolitan Life, Rockwell's sickness and accident policy administrator (Rockwell self-insures both its worker's compensation and sickness and accident benefits), occasionally recommends that the company place an employee receiving sickness and accident benefits under surveillance.

delivered the receipt to Francyzk who in turn notified Sid Williams, Rockwell's industrial relations supervisor. Williams then called Hiatt in to speak with him about the receipt. Hiatt's foreman, Bobbie Harbison (also a good friend of Hiatt's older brother), was at this meeting, along with Francyzk and the union steward, Sherrie Meyer. Williams showed the receipt to Hiatt and asked him if he saw anything unusual about it. Hiatt replied that he did not and denied altering the receipt. Williams disagreed, put Hiatt on twenty-four hour notice, and scheduled another meeting for the next afternoon.[2]

Immediately following the meeting, Hiatt raced home and brought back a pair of shoes he said he had purchased. He confronted Francyzk with the shoes outside of the facility. Francyzk, however, told Hiatt that they would talk about it further the next afternoon. Hiatt then went home and, after searching his papers, found what he alleged to be the real receipt.

The next day, October 24, 1989, Hiatt made another attempt at damage control. He went to Williams' office at 9:00 or 10:00 in the morning and attempted to discuss the matter. He brought the shoes and the receipt with him and at that point admitted to falsifying the receipt. Williams, however, stated that this was what the afternoon meeting was for and refused to discuss the matter further. At the meeting, Hiatt produced the shoes, a shoe box, and the new receipt. The store which issued this receipt, however, could not confirm that Hiatt had purchased the shoes there and the shoes contained no markings to establish when or where they were bought. Hiatt admitted that he had falsified the receipt submitted to nurse Thompson on October 20, but asserted that he had nevertheless made a legitimate purchase. In closing argument to the jury he alleged "laziness" and "stupidity" as his reasons for this unfortunate shortcut. Despite

these efforts, however, Hiatt was terminated for violating plant rule number 2, falsification of personnel or other records. Hiatt admitted that he was aware of this rule and that he could be fired for violating it. A final follow-up meeting was scheduled for October 26. In that meeting the company confirmed its prior decision and Hiatt remained terminated.

The evidence is undisputed as to the roles played by each person involved in Hiatt's termination. Francyzk, Hiatt's supervisor and his contact in workers' compensation matters, participated in these termination meetings as a scribe. He took notes and prepared a transcript of the proceedings. He was also involved in doing some investigating into Hiatt's claim, calling the shoe stores involved and gathering whatever records of purchases were available. He provided this information to Williams, who was in charge of the proceedings, but did not participate in the decision to terminate Hiatt. Williams, Rockwell's industrial relations supervisor, initiated Hiatt's termination meetings, conducted the meetings on behalf of the company, and participated with Roger O'Neill, Rockwell's personnel manager, in the decision to discharge Hiatt. Neither Williams nor O'Neill were responsible for the administration of workers' compensation claims, and Hiatt's prior or pending claims were not discussed during the termination meetings nor during any other discussions on the decision to terminate Hiatt. In addition, neither Hiatt nor his union representatives alleged retaliation during this process. Although Williams acknowledges that he may have known that Hiatt had filed a workers' compensation claim at some point, he testified that he was unaware of the status, number, or extent of any such claims.

After the termination, the union filed a grievance on Hiatt's behalf, alleging that ter-

---

**2.** The company engaged in a series of three meetings as part of the process that ultimately resulted in Hiatt's termination. The first meeting, held on October 23, 1989, resulted in Hiatt's suspension and a 24–hour notice subject to termination. The second meeting, held the next day, was more formal with representatives of the company and the union both present. The decision to terminate Hiatt was made at this meeting. The union

contract with the company then required a third follow-up meeting to be held within three days of termination. This meeting was held on October 26, 1989 with representatives of the union and the company both present. This final meeting provided another opportunity for management and the union to think again about the issue. The company, however, stuck by its previous decision and Hiatt remained terminated.

mination was too severe a penalty where, it was alleged, Hiatt had not intended to defraud the company. Rockwell denied the grievance and the union took no further action on the case.

On August 30, 1990, Hiatt filed suit in Illinois state court, alleging that Rockwell fired him in retaliation for exercising his rights under the Illinois Workers' Compensation Act. Rockwell removed the action to the United States District Court for the Southern District of Illinois and a jury trial commenced on December 7, 1992. On December 9, 1992, the jury returned a verdict for Hiatt in an amount totalling $450,000.00, including $36,188.00 in compensatory and $413,812.00 in punitive damages. Rockwell filed motions for j.n.o.v., a new trial, and remittitur. The district court denied the motions and this appeal ensued.

On appeal, Rockwell alleges that the district court erred in denying the company's motions for j.n.o.v. and a new trial. The company also asserts that the court committed reversible error by prohibiting the company from introducing statistical evidence that it alleges would have demonstrated that significant numbers of workers' compensation recipients remained employed with the company. Rockwell also alleges error in the district court's finding that Hiatt had satisfied his duty to mitigate his damages and alleges error in the court's denial of the company's motion to reverse or reduce the award of punitive damages. Because we reverse, we address only the issues relating to the awards of punitive and compensatory damages.

## II. Analysis

### A. Punitive Damages

We turn first to the issue of punitive damages. Rockwell makes two arguments here: first, that Illinois law requires a significantly higher level of culpability, in addition to the elements of the claim, in order to sustain an award of punitive damages, and second, that Hiatt did not demonstrate facts justifying an imposition of punitive damages in this case.

In this diversity action, we apply the law of Illinois.

The Illinois Supreme Court in *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 563, 384 N.E.2d 353, 357 (1978), first extended the Illinois tort of retaliatory discharge to actions involving workers' compensation claims. *Kelsay* also recognized the validity of punitive damages in such cases where the underlying tort was committed "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Id.* 23 Ill.Dec. at 565, 384 N.E.2d at 359. The court noted in its opinion that this standard would not be met in every case, but would depend on the circumstances. "[W]hen the facts permit, punitive damages may be properly awarded." *Id.* 23 Ill.Dec. at 566, 384 N.E.2d at 360. The court also went on to caution that punitive damages are not favored under Illinois law and that courts must take caution to see that they are not improperly or unwisely awarded. *Id.*

■ Following *Kelsay*, two decisions of this circuit, *United States Fire Ins. Co. v. Beltmann N. Am. Co., Inc.*, 883 F.2d 564 (7th Cir.1989), and *Cash v. Beltmann N. Am. Co., Inc.*, 900 F.2d 109 (7th Cir.1990), held that a claim of retaliatory discharge under Illinois law carries with it a charge of actual malice subsumed within the elements of the claim. *United States Fire*, 883 F.2d at 569. Actual malice is, according to these cases, proved by satisfying the formal elements of the tort and, therefore, the necessary threshold for punitive damages is also met when a plaintiff prevails on the claim. *Id.; Cash*, 900 F.2d at 110. Illinois courts, however, have since rejected this formulation,[3] *see Dixon Distrib. Co. v. Hanover Ins.*, 244 Ill.App.3d 837, 183 Ill.Dec. 919, 924, 612 N.E.2d 846, 851 (1993), lending support to a series of Illinois decisions reversing punitive damage awards in cases where compensatory damage awards were upheld. *See, e.g., Kritzen v. Flender Corp.*, 226 Ill.App.3d 541, 168 Ill.Dec. 509, 519, 589 N.E.2d 909, 919 (1992); *Knecht v. Radiac Abrasives, Inc.*, 219 Ill.App.3d 979,

---

**3.** Decisions of United States district and circuit courts are not binding upon Illinois courts. *See*

*City of Chicago v. Groffman*, 68 Ill.2d 112, 11 Ill.Dec. 283, 286, 368 N.E.2d 891, 894 (1977).

162 Ill.Dec. 434, 436, 579 N.E.2d 1248, 1250 (1991). These cases state clearly that a jury has the discretion to award punitive damages, but that such damages are not required upon a finding of liability. *Knecht,* 162 Ill. Dec. at 436, 579 N.E.2d at 1250. An award of punitive damages should be upheld only if the defendant's misconduct is above and beyond the conduct needed for the basis of the action. *Kritzen,* 168 Ill.Dec. at 519, 589 N.E.2d at 919. Illinois law, therefore, draws a clear distinction between the showing needed for liability and the higher level of culpability needed to sustain an award of punitive damages in retaliatory discharge cases.

■ In reviewing the question of punitive damages in this case, we will follow the rule set down by the Illinois Supreme Court in *Kelsay,* as subsequently interpreted in the Illinois cases set out above. "[W]hile the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly [a question] of law." *Kelsay,* 23 Ill.Dec. at 565, 384 N.E.2d at 359. Our task is to determine whether there is any evidence in the record from which a jury could find the necessary fraud, actual malice, deliberate violence or oppression, willfulness, or gross negligence to support the award in this case.

The company here argues that Hiatt produced no evidence at trial demonstrating the kind of conduct required by the *Kelsay* standard for punitive damages. The evidence in this case shows that Hiatt violated a plant rule and was fired, but only after a series of formal meetings convened for that purpose. These meetings, required by an agreement between the union and the company, ensured that Hiatt received adequate notice and an opportunity to defend any claim brought against him. This also gave the company time to re-think its decision and investigate any allegations made. The record shows that this is exactly what occurred in this case. Hiatt's union representatives were active in his defense and he was provided with the opportunity to explain his actions. Hiatt has pointed to no evidence, and we have found none, that would demonstrate that the employees of Rockwell responsible for his discharge knew or acted in such a way as to show a wanton disregard for Hiatt's rights.

Nor can we find evidence of fraud, malice, or oppression in the way Hiatt was treated as an employee or in regard to his workers' compensation claims. While there is evidence in the record to suggest that Rockwell contested Hiatt's third claim for workers' compensation, the reasons proffered by the company were not unreasonable. For example, Francyzk testified that Hiatt failed to provide the company with sufficient medical documentation to substantiate his third claim for workers' compensation. Hiatt does not contest this and, in fact, proceeded at trial to introduce evidence showing that the appropriate information was supplied only after his initial claim was turned down. Hiatt has presented no evidence, and we have found no indication, that this refusal was fraudulent or malicious. In addition, Rockwell's general treatment of Hiatt and its course of action in regard to Hiatt's termination, simply do not demonstrate utter indifference to, or conscious disregard for Hiatt's rights and the law. *See Kritzen,* 168 Ill.Dec. at 519, 589 N.E.2d at 919. Hiatt was afforded continuing opportunities to work with the company and was provided with a steady flow of light-duty jobs that fit his medical restrictions. Indeed, the evidence suggests that the company may have created some of these positions in order to accommodate Hiatt and his injury. Again, there is no indication of fraudulent or malicious actions on the part of the company. From our review of the record, it is clear that the facts of this case do not justify the imposition of punitive damages. We therefore reverse the award.

## B. Compensatory Damages

We turn next to Rockwell's contention that there was insufficient evidence to support the jury's award of compensatory damages. Rockwell contends that the evidence presented to the jury was insufficient to show that the company discharged Hiatt in retaliation for filing workers' compensation claims. Because the showing needed for liability in these cases requires a lower standard of culpability than the showing required for punitive damages, this is a more difficult ques-

tion and requires a closer review of the evidence presented at trial.

In diversity actions, state law governs the dispositions of motions for directed verdict and j.n.o.v. *Horton v. Miller Chem. Co. Inc.*, 776 F.2d 1351, 1355 (7th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Under Illinois law, a motion for j.n.o.v. will be granted only if all of the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on the evidence could stand. *Pedrick v. Peoria & E.R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513-14 (1967). This circuit has held that under the *Pedrick* test a directed verdict or j.n.o.v. should be granted when the evidence only supports one reasonable conclusion in defendant's favor. *Horton*, 776 F.2d at 1355. In determining whether this standard has been met, all the evidence in a case, not just the evidence which opposes the movant, is considered. *Id.* at 1355; *Miller v. J.M. Jones Co.*, 225 Ill. App.3d 799, 167 Ill.Dec. 385, 390, 587 N.E.2d 654, 659 (1992). The presence of some evidence to the contrary will not prevent the entry of a directed verdict. *Pedrick*, 229 N.E.2d at 510; *Miller*, 167 Ill.Dec. at 390, 587 N.E.2d at 659.

A valid claim for retaliatory discharge under Illinois law requires a showing that an employee has been (1) discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy. *Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 176 Ill.Dec. 22, 30, 601 N.E.2d 720, 728 (1992). In the workers' compensation context, a plaintiff must show (1) that he was the defendant's employee before his injury; (2) that he exercised a right granted by the Workers' Com-

pensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim. *Kritzen*, 168 Ill.Dec. at 515, 589 N.E.2d at 915. Under Illinois law, the element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee. *Hartlein*, 176 Ill. Dec. at 30, 601 N.E.2d at 728.

Rockwell does not contest that Hiatt was its employee prior to his injuries and fully admits that Hiatt exercised his rights under the Act. The company contests only the element of causation, arguing that Hiatt failed to demonstrate a causal connection between his filed claims and his discharge. Rockwell urges that the evidence in this case demonstrates a valid reason for Hiatt's discharge (the falsified shoe receipt—which, we note, Hiatt does not contest) and that the evidence presented at trial did not support Hiatt's allegation that this reason was a mere pretext. We agree, and hold that the district judge should have granted the company's motion for j.n.o.v. on this basis.

We note at this point that Illinois retaliatory discharge cases brought in federal court may be analyzed using the shifting burdens presented in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59-60 (7th Cir. 1990).[4] Under this method, a plaintiff may establish the required "but for" causation without having to present direct or circumstantial evidence that the determining factor in his termination was the exercise of his rights under the Workers' Compensation Act. *See, e.g., Konowitz v. Schnadig Corp.*, 965 F.2d 230, 232 (7th Cir.1992) (age discrimination under the ADEA). Under the

---

**4.** While it is clear that Illinois courts have for the present time rejected the burden-shifting analysis applied in federal courts under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)—choosing instead to treat these actions under a traditional tort analysis, *Netzel v. United Parcel Serv., Inc.*, 181 Ill.App.3d 808, 130 Ill.Dec. 879, 881, 537 N.E.2d 1348, 1350 (1989); *but see Miller*, 167 Ill.Dec. at 389, 587 N.E.2d at 658 (declining to decide whether to use three-tier standard in retaliatory discharge cases)—federal courts may still employ our own

procedural rules, including the sequential inquiry analysis employed in Title VII cases, when hearing cases based on Illinois law. *McEwen*, 919 F.2d at 59-60. As this court stated in *McEwen*, "[s]tate law provides the burden of proof (more accurately, the risk of nonpersuasion) when it supplies the rule of decision. But the sequential inquiry employed in Title VII cases affects the order and burden of raising issues and producing evidence rather than the risk of nonpersuasion once evidence has been brought forward." *Id.* at 59 (internal citations omitted).

*McDonnell Douglas* analysis, the plaintiff first establishes a prima facie claim of discrimination by showing that he was

(1) in a protected class; (2) performing the job satisfactorily; (3) nevertheless the subject of a materially adverse employment action; and (4) others outside the protected class were treated more favorably.

*Id.*

If the plaintiff establishes his prima facie case, the employer must articulate a lawful, non-discriminatory reason for the adverse action. Once the employer satisfies this burden of production, the burden remains with the plaintiff to show that the employer's purported reasons are no more than a pretext.

*Id.* This is done by showing either (1) "that a discriminatory reason more likely motivated the employer," or (2) "that the employer's proffered explanation is unworthy of credence." *Id.* This indirect method of proof compensates for evidentiary difficulties plaintiffs can encounter in discrimination actions "by permitting the plaintiff to prove his case by eliminating all lawful motivations, instead of proving directly an unlawful motivation." *Oxman v. WLS–TV*, 846 F.2d 448, 453 (7th Cir.1988). Therefore,

if a plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent.

*Id.; see also Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994) (if plaintiff shows that reason given by employer is not true—a phony reason—then he has shown pretext and trier of fact is allowed to infer that falsehood was meant to conceal illegal job discrimination).

██ It is unclear whether Hiatt availed himself of the shifting burdens at trial. This, however, is of no consequence on appeal since the plaintiff bears the ultimate burden of proving that his employment was affected by his protected class status. *Mojica v. Gannett Co., Inc.*, 7 F.3d 552, 561 (7th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 363 (1994); *McEwen*, 919 F.2d at 59; *Netzel v. United Parcel Serv., Inc.*, 181 Ill.App.3d 808, 130 Ill.Dec. 879, 881, 537 N.E.2d 1348, 1350 (1989). Once the plaintiff prevails before a jury, the method of proof becomes extraneous. We simply ask whether a verdict for Hiatt could be sustained on the entire record. *Mojica*, 7 F.3d at 561; *McEwen*, 919 F.2d at 60.

██ In this case, it is undisputed that there was no direct evidence that Rockwell fired Hiatt in retaliation for filing workers' compensation claims. Instead Hiatt points to what amount to two lines of circumstantial evidence in his quest to establish the needed connection. First, he points to evidence that he asserts demonstrates friction between himself and his supervisor, Frank Francyzk. He points to Francyzk's challenge to his third claim for workers' compensation benefits, to his desire to cover this claim under Rockwell's sickness and accident plan, and to Francyzk's decision to place him under surveillance during his period of medical leave for this third injury. Francyzk himself admitted at trial that he and Hiatt may have had a "misunderstanding" concerning his third claim for benefits.[5] Assuming that this

---

**5.** Hiatt also argues that Francyzk refused to find him a permanent position within the plant after he returned to work in March of 1989. Illinois law, however, does not require employers to retain employees who cannot work, or even that they must offer injured persons alternative employment commensurate with their reduced capabilities. *McEwen*, 919 F.2d at 60; *Hartlein*, 176 Ill.Dec. at 30, 601 N.E.2d at 728. Illinois allows employers to act on the basis of their employees' physical disabilities. It is only the request for benefits that state law puts off limits as a ground of decision. *McEwen*, 919 F.2d at

60; *Hartlein*, 176 Ill.Dec. at 30, 601 N.E.2d at 728.

Hiatt also argues that after his termination, offers of settlement on his two pending worker's compensation claims were immediately withdrawn. This happened *after* the decision was made to terminate him. Illinois cases state that the critical issue in these cases is the employer's intent *at the time of the discharge. Miller*, 167 Ill.Dec. at 391, 587 N.E.2d at 660. While events occurring after the discharge may be relevant to show such intent, *see id.*, Hiatt has not demonstrated how this was so in this case. Without more, the only permissible inference here is that

evidence indicates animosity on the part of Francyzk toward Hiatt in regard to his pending workers' compensation claims, Hiatt still bore the burden of proving that this animosity played a causal role in his termination. This he has not done.[6]

The record indicates that the decision to terminate Hiatt was made by two persons, Sid Williams, the Centralia plant's industrial relations supervisor, and Roger O'Neill, the Centralia plant's personnel manager. It is undisputed that Francyzk took no part in this decision. Francyzk participated in the formal termination meetings as an investigator and note-taker. There is no evidence that Francyzk discussed Hiatt's pending workers' compensation claims with either Williams or O'Neill at any point in this process and there is no evidence that Williams or O'Neill were in any way influenced by

Francyzk's attitude. Hiatt also does not assert that any of the information given to Williams or O'Neill by Francyzk, the fruits of his investigation or the original altered receipt, was in any way false or exaggerated. Hiatt has therefore failed to show that those in charge of his actual discharge possessed an impermissible ulterior motive.[7] *Cf. Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 151 (7th Cir.1994) ("The alleged statement by Ball [a claims examiner for Yellow Freight] that Mr. Roger [the plaintiff] would never work for Yellow Freight again also fails to establish an issue for trial because Ball played no part in the decision to eliminate Mr. Roger's position. Thus, the evidence offered by Mr. Roger ... does not establish a causal connection between his claim for medical benefits and his discharge.") (internal citations omitted).

---

the termination caused the withdrawals and not the reverse.

6. In his dissent, Judge Will reiterates the facts presented in this case. He would hold, however, that these facts placed alongside the fact that Hiatt was terminated, ought to be enough to allow a jury to infer that the discharge was caused by the workers' compensation dispute. This, however, is not Illinois law. "The causality requirement [under Illinois law] calls for more than a sequential connection—the filing of a workers' compensation claim followed by termination. The plaintiff must affirmatively show that the discharge was primarily in retaliation for his exercise of a protected right." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 149 (7th Cir.1994) (internal citations omitted). Hiatt bore the burden in this case to bring forth evidence demonstrating some link between the two occurrences. He has not done so here.

7. Hiatt also points to evidence in the record suggesting that Williams may have been aware that Hiatt had filed a workers' compensation claim with the company and asserts that O'Neill regularly discussed workers' compensation matters with Francyzk and, therefore, likely knew about Hiatt's claims. Evidence that those responsible for an employee's termination knew that he intended to file, or, as in this case had filed, a workers' compensation action is essential to a retaliatory discharge action under Illinois law. *Marin v. American Meat Packing Co.*, 204 Ill.App.3d 302, 149 Ill.Dec. 818, 822, 562 N.E.2d 282, 286 (1990). While Williams admitted that he may have had knowledge of a claim, Hiatt has put forth no evidence demonstrating that O'Neill had such knowledge. In addition, even if there is knowledge of a filed workers' compensation

claim, Hiatt bore the burden of demonstrating that this knowledge played a causal role in his termination. This he has not done. To excuse Hiatt from his responsibility to bring forth evidence on the issue of causation would be to excuse a threshold inquiry in this case and could work to effectively immunize future plaintiffs from discharge where their employers have knowledge of filed workers' compensation claims (which would be in almost every case).

Hiatt also asserts that Francyzk, Williams, and O'Neill knew that it was against the law to fire him for filing claims and that it would be very expensive to rehabilitate him, as required by the Act, if he could no longer work because of his injuries. He asserted this forcefully to the jury on several occasions. Again, however, Hiatt has made no showing that either Williams or O'Neill were motivated by such knowledge to fire him in retaliation for filing workers' compensation claims. We presume that all employers will keep abreast of the law as it relates to their businesses and their employees and we decline to allow an employer's knowledge of the law to insulate an employee from future discharge. This would only encourage ignorance on the part of employers in order to avoid potential liability.

Finally, Hiatt points to his position on a union workers' compensation committee and an unrelated controversy regarding restricted access to overtime (grievance resolved in his favor) as additional evidence of retaliation. Again, however, Hiatt put forth no evidence demonstrating that Rockwell employees, specifically Francyzk, Williams, or O'Neill, knew that he held such a position with the union. And a grievance unrelated to his workers' compensation claims cannot be used as evidence of retaliation for pursuing his workers' compensation rights.

The second line of evidence that Hiatt relies on to demonstrate that Rockwell's reason for firing him was a pretext, is the alleged disparate treatment that he received in response to his misdeed. In this case, Hiatt alleges (and argued to the jury) that other Rockwell employees had engaged in acts of general deceit against the company but were nevertheless not fired, or were voluntarily reinstated after termination. This, he alleges, demonstrates that the company treated him more harshly because he had filed workers' compensation claims.

In order to demonstrate pretext under the *McDonnell Douglas* analysis, a plaintiff may put forth evidence that (1) employees outside of the protected class (the protected class in this case being workers' compensation filers), (2) who were involved in acts of comparable seriousness, (3) were nevertheless retained or rehired (while the plaintiff was not). *See Bluebeard's Castle Hotel v. Government of Virgin Islands, Dept. of Labor,* 786 F.2d 168, 171 (3d Cir.1986) (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825); *cf. Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1263 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994) (employee of Korean ancestry failed to show disparate treatment "[i]nsofar as the plaintiff has produced insufficient evidence that other, non-Korean, medical technologists were similarly situated and not discharged."); *Johnson v. Artim Transp. System, Inc.,* 826 F.2d 538, 542 (7th Cir. 1987), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988) ("for [a black plaintiff] to succeed in showing racial animus through disparate treatment analysis, he had to show at least some evidence that the grievances of similarly situated white employees were treated differently than was his grievance."). This court has held that acts of comparable seriousness need not be violations of identical company disciplinary rules. *Johnson,* 826 F.2d at 543. Plaintiffs are free to compare similar conduct, focusing more on the nature of the misconduct rather than on specific company rules. *Id.* at 544. In sum, in order to demonstrate pretext through disparate treatment in this case, Hiatt needed to put forth evidence demonstrating that (1) Rockwell employees who had *not* filed workers' compensation claims with the company, (2) and who had engaged in falsifying company records (or some similar conduct), (3) were nevertheless not fired or were voluntarily rehired after they had been terminated by the company.[8]

At trial, Hiatt brought forth several incidents of misconduct by other employees at Rockwell that he asserts qualify under the disparate treatment analysis to demonstrate pretext on the part of the company. All of Hiatt's examples, however, fail to meet at least one of the three elements set out above. For instance, three of the incidents cited by Hiatt involved Rockwell employees who had all filed workers' compensation claims with the company prior to their various misdeeds.[9] Because Hiatt was required to use incidents involving non-workers' compensation filers, these examples are not relevant to show that Rockwell *discriminated* against workers' compensation claimants. Indeed, Hiatt's ex-

---

8. In his dissent, Judge Will takes issue with the first prong of the disparate treatment analysis which requires that comparisons be made to persons outside of the protected class. This prong is not "clearly illogical" as he suggests. *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825 (plaintiff may demonstrate that the "stated reason ... was in fact pretext" by "evidence that [non-class members] involved in acts ... of comparable seriousness ... were nevertheless retained or rehired."). In addition, we agree with Judge Will that there are other methods of proof, besides the disparate treatment analysis, that Hiatt could have used to demonstrate that Rockwell's stated reason was a pretext. Hiatt could, for example, have put forth evidence regarding Rockwell's "general policy and practice with respect to minority [protected class] em-

ployment." *Id.* at 804–05, 93 S.Ct. at 1825. Again, however, Hiatt put forth no such evidence. He took no statistical surveys and did not otherwise attempt to demonstrate a policy or practice of terminating or otherwise mistreating workers' compensation filers. Instead, as noted above, he presented evidence that other workers' compensation filers, who also violated certain rules, were treated better than he (they kept their jobs). This not only does not prove his case, it demonstrates the contrary that Rockwell did not treat workers' compensation filers poorly as a class.

9. The persons involved in these incidents were Joe Galati, Clifford Ward and Brian Mosby, and Larry Kweback.

amples, in this instance, demonstrate *favorable* treatment for members of the protected class in that these employees ultimately retained their jobs. This evidence therefore runs in favor of the company—tending to show the opposite of what Hiatt intended.

Or again, Hiatt cites an incident where two Rockwell employees were reinstated by the company, but only after the company lost in arbitration.[10] In order to be a relevant comparison, however, the company, under the third element above, must have voluntarily reinstated these employees. Here the company terminated the two employees and was forced to rehire them when the company lost in arbitration. There is nothing voluntary about that. Again, if taken on its face, this example runs in favor of the company—demonstrating that the company did *not* treat these employees *differently* from Hiatt, but rather demonstrating that the company stuck by its decision to terminate each. This is not evidence of *disparate* treatment, but rather evidence of *similar* treatment.[11]

Finally, Hiatt cites two incidents at the company where two different employees were suspended for alcohol-related offenses. One employee, Wilson Crabtree, was caught working while smelling of alcohol. He was sent home for the day. The other employee, Steve Hustede, was caught trying to sneak in alcohol the last night of the year before the company took its Christmas break. He was given a disciplinary layoff. In order to show that these incidents demonstrate disparate treatment, however, Hiatt needed to bring

forth examples of other employees who had falsified documents or engaged in some kind of similar misconduct. Alcohol-related offenses are not the same type of misconduct as falsification of records, and it is therefore difficult for us to see how Hiatt was similarly situated with these other employees for purposes of a relevant comparison. *Cf. Johnson,* 826 F.2d at 543–44 (not clearly erroneous for district court to find that other employee misconduct—theft, absenteeism, traffic accidents, failure or refusal to perform assignments—was not similarly situated with intoxication on the job and therefore insufficient to demonstrate prima facie case of racial discrimination).[12] Even if such a comparison were valid, however, Hiatt needed to demonstrate more than occasional leniency toward other employees who had engaged in conduct of a similar nature and who had not filed workers' compensation claims. *See Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931–32 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994). Incomplete or arbitrary comparisons reveal nothing concerning discrimination, *see id.,* and that is all we are left with here. More evidence than the mere fact that other employees were not discharged for at best arguably similar misconduct must be demonstrated to sustain a charge of intentional discrimination. *Bluebeard's Castle,* 786 F.2d at 172.

After clearing our way through the record, we are left with nothing more than bare assertions of retaliation and disparate treatment. Without supporting evidence, these

---

**10.** The persons involved in this incident were Jerry Stall and David Robinson. Rockwell asserts in its brief that these two had also filed workers' compensation claims with the company. Nothing in our examination of the record, however, revealed this fact.

**11.** Hiatt also cites to an incident involving another company employee, Robin Wilson, who is alleged to have picked up a pair of men's shoes from the company's office in charge of shoe reimbursements. The record indicates that company rules allowed for shoe reimbursements for company employees. There is no indication, however, that an employee could use this privilege to acquire shoes for someone other than the one entitled to the reimbursement. Testimony in the record suggests that this would be impermissible under company rules. Hiatt alleges that this is what Wilson did in this case. However,

there is no evidence in the record to support this allegation, save Hiatt's own testimony. Each Rockwell employee questioned about this matter at trial stated that they were unfamiliar with the incident. Hiatt's burden in this case was to prove retaliatory intent on the part of Rockwell. *Hess v. Clarcor, Inc.,* 237 Ill.App.3d 434, 177 Ill.Dec. 888, 900, 603 N.E.2d 1262, 1274 (1992). Without any evidence that the relevant company employees knew that this happened, no inference of retaliatory intent can be drawn.

**12.** Rockwell, on the other hand, put forth evidence that at least six hourly employees and several other company employees were terminated on the first offense for falsifying company documents, including false information on medical history questionnaires, return to work statements and other similar documents.

assertions are not persuasive. We conclude, therefore, that Hiatt's proffered evidence was insufficient to demonstrate that the company's reason to fire him was a pretext. Hiatt argued to the jury that Rockwell is guilty of an overly harsh punishment. That, however, is not the issue in this case. The question is not whether Rockwell is a benevolent company, but rather whether Rockwell discharged Hiatt for filing workers' compensation claims.[13] In Illinois, an employer is liable in tort only when a plaintiff sets forth sufficient evidence of the defendant's illegal motive. *Horton*, 776 F.2d at 1359. Such evidence was not presented in this case.

### III.  Conclusion

For the foregoing reasons, the judgment of the district court is

**REVERSED.**

WILL, District Judge, concurring in part and dissenting in part.

I concur in the reversal of the jury's award of punitive damages in this case. The evidence does not show malice, oppression or fraud by the company with respect to Hiatt and his worker's compensation claims.

I do not agree, however, that the jury could not reasonably have concluded from all the evidence that Hiatt's worker's compensation claims were the underlying motive for his discharge and the false shoe purchase receipt grounds merely a pretext justification for it.

There was considerable evidence that various Rockwell officials were unhappy about Hiatt's three worker's compensation claims. His supervisor Frank Francyzk, who was also Hiatt's principal company contact on such claims, at one point initiated surveillance over Hiatt's daily activities to see if he

was malingering or exaggerating his injuries and could in fact return to work. When Hiatt filed his third claim for reinjuring his left knee in October 1987, the company denied the claim on the ground that he had failed to provide necessary medical documentation. When he did, it offered to cover his injuries but only under its sickness and health policy, which Hiatt declined on the ground that he was entitled to full worker's compensation for his injury.

Rockwell also contested Hiatt's worker's compensation claim which related to the carpel tunnel syndrome that had developed from his knee injuries. That claim was still pending at the time of his discharge and was only settled by the company after the discharge which is the subject of this suit.

The company does not contend that Hiatt was not injured in the course of his employment nor that his claims were false. It does deny that they were a cause of his discharge. It contends that his filing of a claim for reimbursement for the purchase price of a pair of safety work shoes to which he was entitled under the union contract justified his discharge because he submitted a false receipt as proof of his purchase.

What happened is that, when a Rockwell nurse reviewed Hiatt's request for reimbursement, she became suspicious of the receipt, and took it to Francyzk, who had earlier ordered the surveillance. He turned it over to Sid Williams, Rockwell's industrial relations supervisor, who called in Hiatt to speak about the receipt. Francyzk, a union steward, Sherrie Meyer, and Hiatt's foreman, Bobbie Harbison, were also present at this meeting, which took place on October 23, 1989. Williams asked Hiatt about the receipt and if he had altered it. Hiatt denied that he had. Williams said he didn't believe him and

---

13.  The dissent places great weight on Hiatt's allegation that Rockwell reacted too harshly to his "mistake" with the shoe receipt. Company disciplinary policies and procedures, however, especially when carefully worked out between the union and the company, are not reviewable by this court. As this court has noted on many occasions, we do "not sit as a super-personnel department that reexamines an entity's business decisions." *Yellow Freight*, 21 F.3d 146, 151 (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987)). " 'No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the prohibition against retaliatory discharge does] not interfere.' " *Id.* (quoting *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 560 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)).

put him on 24–hour notice subject to termination and scheduled another meeting for the next afternoon, October 24.

After the meeting, Hiatt went home and came back with the pair of shoes he said he had purchased, showing them to Francyzk who refused to discuss the matter with him but said it would be discussed at the afternoon meeting the next day. Hiatt then went home again, searched among his papers and found what he said was the real receipt for the shoes.

The next morning he brought the shoes and the receipt to Williams' office and tried to talk to him, explaining that he had found the actual receipt and showing him the shoes. Williams, like Francyzk, refused to discuss the matter and told him that the afternoon meeting was for that purpose.

At that meeting, which was more formal and attended by more Rockwell representatives including Williams, Roger O'Neill, Rockwell's personnel manager, Francyzk, and other company representatives, as well as union representatives, Hiatt produced the shoes, a shoe box and what he said was the correct receipt, admitting that the first receipt he had submitted was false but stating that he had made a legitimate purchase. Francyzk, who in the meantime had undertaken to investigate Hiatt's claim and who had contacted the shoe stores involved and had gathered whatever records they had, stated that the store which had issued the "real" receipt could not confirm that Hiatt had bought the shoes there. The shoes, in addition, contained no markings which would establish from which store they were bought. At the conclusion of this meeting, O'Neill and Williams announced that Hiatt was terminated for violating plant rule number 2, which prohibited falsifying personnel or other records.

A third meeting was held on October 26, with representatives of the company and the union present, at which the company was urged under all the circumstances not to discharge Hiatt over so relatively insignificant a claim as one for reimbursement for the price of a pair of shoes when there was evidence that he had in fact purchased them. The company representatives refused.

The jury which heard the evidence and was properly instructed found that a cause of Hiatt's termination was retaliation by the company for his worker's compensation claims which it was disputing and about which it had even initiated surveillance, and that the falsification ground with respect to the reimbursement for the safety work shoes was pretextual.

The majority concedes that under Illinois law a motion to set aside a jury's verdict will be granted only if all the evidence when viewed most favorably for the nonmoving party so overwhelmingly favors the movant that no contrary verdict reasonably could stand. *Pedrick v. Peoria & E.R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967). This Court has held that a jury's verdict should be set aside only when the evidence supports only one reasonable conclusion and that in defendant's favor. *Horton v. Miller Chem. Co.*, 776 F.2d 1351, 1355 (7th Cir. 1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Both jurisdictions in effect apply the clearly erroneous standard.

Cases involving a claim that discharge from employment had a causal connection to the employee's filing of a worker's compensation claim, like many other cases involving the state of mind of one or more persons, almost always depend on circumstantial evidence. Employers seldom state that they are discharging an employee because of filing worker's compensation claims or because of race, sex, age, etc. Nor do criminals announce their intent.

Here there is much circumstantial evidence from which the jury could reasonably have concluded that there was a causal connection between the worker's compensation claims and the discharge. The company was contesting at least two of them. Francyzk, Hiatt's supervisor, was fully aware of Hiatt's several worker's compensation claims and had even initiated surveillance of Hiatt's daily activities to obtain evidence with respect to the claims. Francyzk took the questioned receipt to Williams, who acknowledged that he may have known about Hiatt's worker's compensation claims although he was un-

aware of the details. Francyzk participated in all three of the termination meetings, took notes and prepared a transcript of the proceedings. He also investigated Hiatt's claim for reimbursement for the pair of safety shoes, called on the two shoe stores which had issued the receipts, gathered what records they had and reported that they could not confirm Hiatt's purchase from the receipts. The jury might well have believed that Francyzk, who was the company's prime contact with Hiatt on the worker's compensation claims, was endeavoring to build a case for discharge.

That inference would be substantiated by the manner in which Francyzk and Williams treated Hiatt's efforts to correct his mistake in submitting a false receipt by showing them another receipt, the shoes and a shoe box. Neither would discuss the matter with him, insisting that it could be discussed only at a termination hearing. At that hearing and a subsequent one the next day, notwithstanding that Hiatt presented what he asserted was the correct receipt, the shoes and a shoe box, the company representatives ordered his discharge over his submission of a false receipt for the purchase price of a pair of shoes.

The majority says there is no direct evidence that Francyzk discussed Hiatt's pending worker's compensation claims with either Williams or O'Neill at any time before or during the four or five days he was talking to them and attending meetings with them. While it is true that there is no direct evidence to that effect, the jury could well have believed that the subject came up in their several conversations before, during or after the meetings given Francyzk's and the company's substantial opposition to Hiatt's claims.

That inference is further warranted by evidence that O'Neill, as personnel manager, regularly discussed worker's compensation matters with Francyzk and was undoubtedly aware that the company was opposing Hiatt's claims. It is a particularly permissible inference given the other facts: the refusal to discuss the matter, the rejection of Hiatt's evidence and explanation, and the magnification of a dispute over reimbursement for the price of a pair of shoes into grounds for discharge.

The majority in its footnote 6 states that I agree with its presentation of the facts and, therefore, am in error under Illinois law in disagreeing with its conclusion. With all due respect, that is a misunderstanding. The majority, for example, states that there "is no evidence that Francyzk discussed Hiatt's pending claims with either Williams or O'Neill at any point...." While there is no direct evidence to that effect, there certainly is substantial circumstantial evidence to support the conclusion that he did and the jury apparently so found. Contrary to the majority assertion in its footnote, Illinois law already recognizes that the nexus between worker's compensation claims and discharge almost always must be established by circumstantial evidence since employers rarely state that they are discharging an employee on illegal grounds. *Horton,* 776 F.2d at 1355 ("The non-movant 'has the right to prove ... [his case] by circumstantial evidence, which consists of proof of facts and circumstances from which the jury may infer other connected facts, reasonably following from the proven facts and circumstances.' ") (quoting *Sandburg–Schiller v. Rosello,* 119 Ill.App.3d 318, 74 Ill.Dec. 690, 702, 456 N.E.2d 192, 204 (1983)). Moreover, not only do I not agree with the majority's statement of the evidence, but I disagree with its omission of any reference to important facts such as those which suggest that O'Neill regularly discussed worker's compensation matters with Francyzk and knew that the company was unhappy about Hiatt's worker's compensation claims.

In addition to all of the foregoing evidence from which the jury could reasonably infer retaliation was the evidence that Hiatt received disparate treatment, that other Rockwell employees had engaged in much more serious misconduct and were not fired or were reinstated. The majority seeks to distinguish three of Hiatt's examples on the anomalous ground that, like him, they had all filed worker's compensation claims prior to their various misdeeds and were not fired, which showed, the majority says, that Rockwell did not discriminate against such claim-

ants. But the majority misses the point. Hiatt doesn't contend, and need not prove, that Rockwell discriminated against all worker's compensation claimants. He asserts only that, because they didn't fire other employees—whether claimants or not—for more serious misdeeds, his discharge was disparate treatment.

The majority, for some reason I don't understand, believes that only more favorable treatment for non-worker's compensation filers would be relevant to show that Hiatt received disparate treatment. It seems to me to be even stronger evidence of disparate treatment of Hiatt that other worker's compensation claimants who were guilty of more serious violations of company rules were either not fired or were reinstated. The majority's insistence that only the treatment of non-filers is relevant but that the more lenient treatment of persons who had filed claims similar to Hiatt is not is, to me, clearly illogical and inconsistent with the decided cases.

The evidence which the majority would require Hiatt to produce—more favorable treatment of non-filers—clearly plays an important role in the burden-shifting analysis articulated by the Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas,* the Court found evidence that employees outside the protected class who engaged in acts of comparable seriousness were nonetheless retained or rehired to be "especially relevant." *Id.* at 804, 93 S.Ct. at 1825. However, the Court also explained that "[o]ther evidence that may be relevant to any showing of pretext includes facts as to the [employer's] treatment of [employee] during his prior term of employment; [employer's] reaction, if any, to [employee's] legitimate [protected] activities; and [employer's] general policy and practice with respect to [protected class] employment." *Id.* at 804–05, 93 S.Ct. at 1825. As explained above, I believe that Hiatt has offered more than sufficient evidence concerning Rockwell's past treatment of him and his worker's compensation claims to support a jury verdict in his favor in this case.

This "other evidence" is clearly relevant to a consideration of pretext and is crucial to a fair adjudication of retaliatory discharge claims. Under the majority's rule, employers who selectively discharge only those worker's compensation claimants who file the most vexatious claims would never be discouraged because, as long as not all claimants were discharged or non-filers were generally not treated more favorably as a class, no retaliatory discharge claim could succeed. In an action for retaliatory discharge, Hiatt is not required to demonstrate that the defendant discriminated against *all* worker's compensation claimants at the plant; rather, he must show that he was discharged for the exercise of his rights under the Illinois Workman's Compensation Act. *Horton,* 776 F.2d at 1356 ("to show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged . . . and (2) the employer's motive in discharging him . . . was to deter him from exercising his rights under the Act or to interfere with the exercise of those rights").

The majority concludes that, while Rockwell "may be guilty of an overly harsh punishment, that was not the issue in this case." While it may not be the ultimate issue, it certainly is not irrelevant. The "overly harsh punishment," firing an employee over mistakenly filing a false receipt in seeking reimbursement to which he was entitled for the purchase price of a pair of work shoes, and then refusing to reconsider when he produced the shoes, the box in which they allegedly came and another receipt reflecting their purchase are certainly evidence which a jury may consider in determining if an employer's explanation of a discharge is pretextual and the causation is really something else, here displeasure over Hiatt's several worker's compensation claims, his refusal to settle one claim under the company's health and accident plan and the pendency of the carpel tunnel syndrome claim which was not settled until after he was fired. The fact that the punishment was excessive and did not fit the alleged crime is certainly evidence that the crime may not in fact have been the reason for the punishment.

The jury and the judge who heard all the witnesses and observed all the evidence obviously concluded that the causation for Rockwell firing Hiatt was his worker's compensation claim history and not the relatively insignificant shoe reimbursement claim episode. The record, in my opinion, clearly warrants that conclusion. It certainly cannot be said to be so devoid of supporting evidence, albeit circumstantial, that the only reasonable conclusion requires a directed verdict for the defendant or an order setting aside the jury's verdict.

As the majority recognizes, Illinois law requires a significantly higher degree of culpability for punitive than for compensatory damages. The Illinois cases also hold that whether the facts of a particular case justify the imposition of punitive damages is properly a question of law.

The award of compensatory damages, on the other hand, is a question of fact for the jury and may properly be set aside in a j.n.o.v. only if, viewing the evidence in the light most favorable for the plaintiff, it overwhelmingly favors the defendant and supports only one reasonable conclusion and that in the defendant's favor, in other words, that the jury's verdict is clearly erroneous. *Pedrick,* 229 N.E.2d at 513–14; *Horton,* 776 F.2d at 1355.

Applying these principles, I concur in the setting aside of the award of punitive damages but strongly oppose substituting our evaluation of the evidence for that of the jury and the trial judge who heard and saw it. I would, therefore, affirm the award of compensatory damages.