Michael A. **MEISTER** and Edward F. Swartz, Plaintiffs–Appellants,

v.

**GEORGIA–PACIFIC CORPORATION** and Mail–Well Envelope Company, Defendants–Appellees.

No. 94–1386.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1994.

Decided Jan. 3, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 9, 1995.

Marilyn F. Longwell (argued), Heidi L. Widell, Robert P. Sheridan, Chicago, IL, for Michael A. Meister, and Edward F. Swartz.

John W. Noble, Jr., Rivkin, Radler & Kremer, Chicago, IL, Robert H. Buckler, Robert P. Riordan (argued), Alston & Bird, Atlanta, GA, Paul E. Freehling, D'Ancona & Pflaum, Chicago, IL, for Georgia–Pacific Corp. and Mail–Well Envelope Co.

Before POSNER, Chief Judge,
ESCHBACH, and RIPPLE, Circuit Judges.

ESCHBACH, Circuit Judge.

Plaintiffs, Michael A. Meister ("Meister") and Edward F. Swartz ("Swartz"), brought this diversity action under Illinois law charging that their former employer, Georgia–Pacific Corporation ("G–P") and Mail–Well Envelope Company ("Mail–Well"), unlawfully terminated them in retaliation for reporting the alleged solicitation of a "kickback" from a vendor by a co-employee and a subsequent extortion attempt by the same employee. The district court granted summary judgment for G–P and Mail–Well and the plaintiffs appeal. We affirm.

## I. BACKGROUND

G–P, a Georgia corporation, is engaged in the pulp, paper and building products industries throughout much of the United States. In March 1990, G–P acquired Great Northern Nekoosa Company, which owned Butler Paper Company ("Butler") and all of Butler's ownership interests, including Mail–Well. Thus, through this acquisition, G–P became the owner of Mail–Well, a company which operates several plants, including one in Chicago, Illinois, where envelopes are cut, folded and shipped.

Meister was the plant manager for Mail–Well's Chicago plant and Swartz was the production scheduler for the plant. As plant manager, Meister oversaw, among other things, the shipping department where "tariffs" or rates are negotiated with shipping companies. In this position, Meister was directly responsible for the shipping supervisor. Prior to the events in this case, Meister terminated the shipping supervisor, Roman Kuzmyn ("Kuzmyn"), in March 1990, in part because he had improperly negotiated a shipping tariff. After Kuzmyn's termination, the three shipping lead men, including Ronald Merker ("Merker"), were in charge of the shipping department under Meister's supervision. In February 1991, Dave Gerrasch ("Gerrasch"), the plant's general manager and Meister's direct supervisor, named Merker acting shipping supervisor.

### A. Reporting The Alleged Kickback and Extortion Attempts

At the time of the incidents surrounding this case, Capitol Motor Service, Inc. ("Capitol") hauled a significant portion of the freight carried from Mail–Well's Chicago plant. Capitol was owned and operated by Richard Peluso ("Peluso"), a friend of Swartz who owned and trained race horses. Swartz had introduced Peluso to Merker in 1990 during a trip to Arlington Park race track. According to the plaintiffs, in July 1991, Merker approached Swartz and asked him to solicit kickbacks from Capitol. Swartz subsequently reported Merker's remarks to Meister. Although concerned, Meister de-

cided not to report this incident to his superiors. Instead, he chose to carry out his own internal investigation by keeping a closer eye on the shipping department.

In June 1991, upon Meister's recommendation, Gerrasch promoted Merker from acting shipping supervisor to shipping supervisor. The notice of Merker's promotion was posted on July 17, 1991 and became effective on August 1, 1991. Meister, however, kept silent as to Swartz's allegations about Merker and allowed the promotion to proceed. Several pieces of information came to light after Merker's promotion. In the fall of 1991, Merker told Meister that he was training Peluso's race horses. In December 1991 Meister learned that Merker's training was in return for an ownership interest in Peluso's horses. Finally, in late December 1991, Swartz informed Meister that Merker had shipped a large volume of freight by Condor Air Freight Company ("Condor"). Swartz and Meister were suspicious due to the large cost entailed by an air freight shipment, especially with a carrier for whom there were no negotiated rates on file with the company. Merker, claiming to have had authorization to use Condor from the Sales Manager, accused Meister and Swartz of being overly concerned with his use of a carrier other than Capitol because they were accepting kickbacks from Capitol. The next day, December 27, 1991, Merker went to Clare Sill ("Sill"), the plant's human resources administrator, and reported his concerns that he was being "set up" by Meister and Swartz to look like he was taking kickbacks.

According to Swartz, on Sunday, December 29, 1991, Merker called him at his home and told him he wanted $5000 from Capitol for freight business or he would accuse Swartz of taking kickbacks from Capitol. Swartz reported this extortion attempt to Meister the next day. Meister immediately called Gerrasch and reported Merker's statement. At that point, Meister also informed Gerrasch of the incident in July of 1991 and

his ongoing investigation of Merker's activities. Gerrasch and Meister arranged to meet to further discuss the situation on January 2, 1992. In the meantime, Gerrasch arranged to have a conference call with Swartz and Sill, during which Swartz repeated his version of the conversation with Merker.

On January 2, 1992, Gerrasch and Meister met to discuss the allegations. Later that day, they confronted Merker with Swartz's statements and he responded by alleging that Meister and Swartz were themselves receiving kickbacks from Capitol. Finding himself at an impasse, Gerrasch resolved to make some organizational changes until the matter could be investigated further. After the meeting, Gerrasch removed the responsibility for the shipping department from Meister and put another individual, Jay Burman ("Burman"), in charge. Merker was ordered to report to Burman rather than Meister during this period. Gerrasch also directed Burman to audit the Capitol bills to determine if a problem existed.

A few weeks later, Meister traveled to a manager's meeting at Mail–Well's headquarters in Colorado, where he spoke with Timothy Sparks ("Sparks"), the Manager of Employee Relations for Butler and Mail–Well. Meister, under the impression that Gerrasch was going to contact the G–P investigator about the incidents, asked Sparks if he knew of any investigation being conducted in Chicago. Sparks was unaware of any investigation, but promised to make some inquiries. Upon checking with George Foster ("Foster"), the Director of Corporate Security at G–P,[1] Sparks informed Meister that Foster knew of no such investigation being conducted at Chicago's Mail–Well plant. Meister expressed his disappointment that Gerrasch had not contacted Foster. Sparks informed Meister that he could make a "hotline" call,[2] or speak directly with the President of Mail–Well, Jim Bostic ("Bostic"). Although

1. Foster was a former agent for the Federal Bureau of Investigation who would have normally conducted or participated in such an investigation.

2. The "hotline" number was established by G–P's corporate security department to enable employees to report unethical or illegal activity under the cover of anonymity and without fear of reprisal from the person against whom the employee has informed.

Sparks reported that Meister was concerned that Gerrasch might endanger his job should he go over Gerrasch's head and report the matter to senior management, Meister agreed to speak with Bostic over the telephone. In his conversation with Bostic, which was put on speaker so that several other members of Mail–Well's senior management could participate, Meister first sought assurance that his job would not be endangered by reporting the information about Merker. Bostic told him that under the company's Code of Conduct policy, he would not face retaliation for reporting illegal or unethical conduct. Meister then proceeded to provide a detailed account of the events at the Chicago Mail–Well plant. After the call was completed, Bostic instructed Sparks to have the matter investigated. John Slattery ("Slattery"), Mail–Well's Vice–President and Gerrasch's immediate supervisor, called Gerrasch and told him that there would be an investigation by G–P and that he was to cooperate with the investigators.

## B. *G–P's Investigations*

While Burman's audit of the Capitol bills was the first step in investigating the kickback allegations, G–P did not formally begin to investigate the matter until Sparks turned the matter over to Foster for an official investigation. In a memorandum dated January 30, 1992, Sparks advised Foster of the facts known to him, without revealing that Meister was the informant in this case. Foster then traveled to the Chicago plant to conduct his investigation on February 4 and 5, 1992. During the course of his investigation, Foster spoke with Gerrasch, and then interviewed Meister, Swartz and Merker. He also contacted Peluso of Capitol, who denied having first-hand knowledge of any kickback attempts. Faced with conflicting unsubstantiated allegations, Foster reported to G–P's Code of Conduct Committee that his investigation was inconclusive as to the existence of kickbacks. The Code of Conduct Committee, comprised of several managers

of G–P, monitors reports of illegal or unethical conduct within G–P or its subsidiaries. Upon reviewing Foster's findings, the Committee determined that further investigation was necessary. Several members of the Committee expressed concern about a conflict of interest between some of the employees and Capitol and the possibility that this may have resulted in Capitol overcharging for its services.

In the interim after Foster left Chicago and before a new investigation was initiated, Gerrasch allegedly told Meister on February 7, 1992 that he was going to "get that asshole who called corporate" and that he had a pretty good idea of who made the call.[3] Gerrasch purportedly felt the investigation was a "black eye" for the Chicago Mail–Well plant and that corporate headquarters would question the abilities of all Chicago managers as a result. Gerrasch stated that they would need to get ready for a major audit because of the call.

As a result of the questions raised by the Code of Conduct Committee, a second investigation was launched. Two members of G–P's internal audit department, James Blasingame ("Blasingame"), and Steve Witmer ("Witmer"), were dispatched to Chicago's Mail–Well plant on March 2, 1992. They spoke to Gerrasch, Meister, Swartz and Merker and reviewed the plant's personnel files and shipping records with the assistance of Burman. They also spoke to two vendors, Peluso from Capitol, and Rob Porento ("Porento"), owner of Best Cutting Die Company, who revealed that Merker also trained and shared an ownership interest in race horses with his family. During the course of their investigation, Blasingame informed Gerrasch that it was Meister who had reported the allegations to corporate headquarters. Blasingame also asked Gerrasch to write a report reflecting Gerrasch's impressions of the allegations and the parties involved. Gerrasch's report, written sometime later, recommended the termination of all three individuals.[4] Blasingame and Witmer, however,

---

**3.** Although Gerrasch admits to using the word "asshole," he could not recall saying "I'm going to get" the person who called corporate.

**4.** Gerrasch's report was addressed to Slattery. Blasingame is not certain whether he saw this report before preparing his report of the investigation.

were not able to establish the existence of any kickbacks. They did discover Merker's part ownership in race horses with Peluso and that Peluso paid for weekly lunches at the race track with Swartz, and occasionally with Meister. Swartz was also pinpointed as the party who had provided much of the information concerning the investigation to Porento before G–P's investigators had a chance to question him. Finally, based upon their review of Burman's audit and his solicitation of bids offering substantially cheaper rates than Capitol charged, they concluded that Capitol's rate structure accounted for approximately $84,000 in excessive freight payments in 1991 by Mail–Well.

After receiving Blasingame and Witmer's report, Sparks asked Al Willis ("Willis"), the Traffic Manager at Butler and Mail–Well in Colorado, who was responsible for monitoring the shipping rates of outside carriers, to independently analyze the data regarding Capitol's shipping rates at Mail–Well's Chicago plant from September 1990 through December 1991. Willis conducted his audit in April 1992. Comparing Capitol's rates with those of other carriers, Willis found that while some of Capitol's rates were competitive, some were "way out of line." He concluded that Mail–Well paid an excessive amount to have Capitol haul its products.

On April 15, 1992, Sparks and Slattery traveled from Colorado to Chicago to personally interview Meister, Swartz and Merker. Upon Merker's suggestion, they also interviewed Kuzmyn, the previous shipping supervisor. Kuzmyn claimed that he had been discharged because of his failure to play along with Swartz and Meister and assign the freight to Capitol.

At the conclusion of the interviews, Sparks and Slattery suspended Meister, Swartz, and Merker pending a decision about their future employment with the company. In an April 22, 1992 memorandum, Sparks and Slattery formulated their conclusion that the three individuals should indeed be terminated from employment with Mail–Well. They discussed their recommendations with Gerard Brandt ("Brandt"), President of Mail–Well.[5] Brandt concluded that Meister, Swartz and Merker should all be terminated.

### C. District Court Proceedings

On September 30, 1992, Meister and Swartz filed a four count complaint against G–P in federal district court alleging that they were unlawfully terminated in retaliation for reporting the purported solicitation of a kickback from a vendor by a co-employee. Plaintiffs asserted claims for retaliatory discharge, breach of employment contract, promissory estoppel, and breach of contract for failing to follow procedures governing employee discipline and discharge. On January 26, 1993, they amended their complaint to include Mail–Well as a defendant. After conducting extensive discovery, Defendants moved for summary judgment on all counts. On January 20, 1994, the district court granted Defendants' motion for summary judgment. Plaintiffs filed a timely notice of appeal pursuant to 28 U.S.C. § 1291.

### II. DISCUSSION

■■■ The single issue raised by the plaintiffs is whether their claim for retaliatory discharge was properly dismissed on summary judgment.[6] We review the district court's grant of a motion for summary judgment *de novo*. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994). We construe the evidence in the light most favorable to Meister and Swartz and draw all reasonable inferences in their favor. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir.1994). Summary judgment will not be defeated, however, simply because issues of motive or intent are involved. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 148 (7th Cir.1994). If Meister and Swartz fail to establish a genuine issue of material fact as to G–P and Mail–Well's motive or intent, summary judgment is appropriate. *Id.*; *McMillan v. Svetanoff*, 878 F.2d 186, 188–89 (7th Cir.1989).

---

**5.** During the course of the various investigations, Bostic had been promoted and Brandt was named President of Mail–Well.

**6.** Plaintiffs fail to discuss their contract-based claims in their briefs. Therefore, they are not properly before us on appeal.

■ As the name implies, an at-will employee is generally subject to discharge for any reason or for no reason at all. *Roger,* 21 F.3d at 149; *Hartlein v. Illinois Power Co.,* 151 Ill.2d 142, 176 Ill.Dec. 22, 30, 601 N.E.2d 720, 728 (1992); *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 15, 421 N.E.2d 876, 878 (1981). However, Illinois law recognizes an exception to this general rule for the tort of retaliatory discharge. *Id.* To establish a cause of action for the tort of retaliatory discharge, an employee must demonstrate the following three elements under Illinois law: (1) an employee must establish that he has been discharged; (2) he must demonstrate that his discharge was in retaliation for his activities; and, (3) he must show "that the discharge violates a clear mandate of public policy." *Hiatt v. Rockwell Int'l Corp.,* 26 F.3d 761, 767 (7th Cir.1994); *Belline v. K–Mart Corp.,* 940 F.2d 184, 186 (7th Cir.1991); *Hartlein,* 176 Ill.Dec. at 30, 601 N.E.2d at 728. The principal issue on appeal is whether the plaintiffs have sufficiently established that their discharge was in retaliation for their activities to survive a motion for summary judgment.[7] We are guided by the well-established principle in Illinois retaliatory discharge cases that "[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein,* 176 Ill.Dec. at 30, 601 N.E.2d at 728; *Marin v. American Meat Packing Co.,* 204 Ill. App.3d 302, 149 Ill.Dec. 818, 821, 562 N.E.2d 282, 285 (1990); *Slover v. Brown,* 140 Ill. App.3d 618, 94 Ill.Dec. 856, 858, 488 N.E.2d 1103, 1105 (1986). This principle incorporates the elements of our procedural requirement that once the employer produces some valid reasons for the dismissals, the burden remains with Meister and Swartz to show that the employer's purported reasons are no more than a mere pretext.[8] *See Hiatt,* 26 F.3d at 768; *McEwen v. Delta Air Lines, Inc.,* 919 F.2d 58, 59 (7th Cir.1990).

■ Meister and Swartz offer no direct or circumstantial evidence that the decisionmakers sought to retaliate against them for reporting the alleged kickback scheme. Although the decision to terminate Meister and Swartz was approximately four months after Meister reported the alleged kickback and extortion scheme to Bostic and Sparks, "[t]he causality requirement calls for more than a sequential connection." *Roger,* 21 F.3d at 149. The only retaliatory animus they can point to is Gerrasch's statement that he was going to "get the asshole who called corporate." Viewing this evidence in the light most favorable to the plaintiffs, it establishes that Gerrasch may have been motivated to retaliate. The plaintiffs still must prove that Gerrasch's retaliatory motive played a causal role in their termination. This they have failed to do.

The decision to terminate Meister and Swartz was made by Brandt after meeting with Sparks and Slattery at Mail–Well headquarters in Colorado. Gerrasch did not participate in the decision to terminate at all. This fact alone is highly probative on the issue of causation. *See Hiatt,* 26 F.3d at 769 (reversed district court's denial of defendant's j.n.o.v. motion because supervisor who had the alleged retaliatory motive was an investigator, but did not participate in the decision to terminate); *Cf. Robinson v. PPG Indus.,* 23 F.3d 1159, 1165 (7th Cir.1994) (reversed district court's grant of summary judgment in favor of the employer since the supervisor who had the alleged retaliatory motive actually participated in the decision to terminate). Thus, Meister and Swartz have failed to prove that the people in charge of their "actual discharge possessed an impermissible ulterior motive." *Hiatt,* 26 F.3d at 769.

■ The plaintiffs counter that, even if Gerrasch was not a decisionmaker, he was

---

7. Although the last element of the tort of retaliatory discharge is not before us, we note that "the great majority of Illinois courts interpreting Illinois law hold that an employee who reports unlawful conduct to an employer is protected under the tort of retaliatory discharge." *Belline,* 940 F.2d at 187 (collecting cases).

8. Of course, the need to discuss whether the employer's purported valid reasons were pretextual would be obviated if Meister and Swartz had direct or circumstantial evidence that their reporting of the alleged kickback scheme was the reason they were discharged. However, they have presented no such evidence.

sufficiently involved in the investigation so as to taint its results. Foster, Blasingame, and Witmer began their respective investigations by speaking to Gerrasch. Moreover, Blasingame asked Gerrasch to submit a memorandum of his impressions of the events. This memorandum, addressed to Slattery, recommended the dismissals of Meister, Swartz and Merker. Causation may be demonstrated, despite the decisionmakers' absence of a retaliatory motive, if the terminated employee can show that the ultimate decisionmakers solicited and relied upon a general evaluation of his performance by an employee who possessed a retaliatory motive. *See Dey*, 28 F.3d at 1459 (ultimate decisionmaker solicited and relied upon the general impressions of the supervisor against whom sexual harassment complaints were being made as to the alleged victim's job performance).

The record reflects that Gerrasch was sufficiently distanced from the investigation and termination decisions so as to free them from taint. Three separate investigations were conducted, all by individuals who operated outside of the Chicago Mail–Well plant. Foster, Blasingame and Witmer worked for G–P in Atlanta, Georgia. Slattery, Sparks and Brandt worked at Butler and Mail–Well's headquarters in Englewood, Colorado. Willis, who conducted an independent audit of Mail–Well's use of Capitol, also worked in Colorado. The only person to have investigated the matter while working at the Chicago Mail–Well plant was Burman, but there is no suggestion that Burman was tainted by Gerrasch's retaliatory motive. Burman's data was independently reviewed by Blasingame and Witmer and his findings were checked by Willis' audit.

Gerrasch's memorandum does not change this conclusion. The only purported influence Gerrasch's memorandum had on the investigation was to supply the shipping data which Blasingame, Witmer, and subsequently Sparks, used in their own reports. However, the plaintiffs admit that Gerrasch obtained this data from Burman, and Blasingame and Witmer reviewed Burman's data to reach the same conclusion as Gerrasch. Sparks then independently verified these conclusions through Willis' audit. Nor did Gerrasch's

memorandum alert them to a problem of which they would have been unaware. G–P's Code of Conduct Committee was already suspicious of the effect the possible conflicts of interest were having on Capitol's shipping rates when they ordered Blasingame and Witmer's investigations. Moreover, Gerrasch's memorandum may have actually limited, rather than promoted, his own recommendations. Upon receiving the memorandum, Slattery called Gerrasch, questioned him about why he had written the memorandum and expressed his displeasure over his having done so. Thus, Gerrasch does not appear to have infected the ultimate decision.

Furthermore, G–P and Mail–Well expressed legitimate reasons for terminating Meister and Swartz's employment which are supported by the record. According to G–P and Mail–Well, Meister was terminated for several reasons. First, Meister failed to report Merker's alleged July 1991 solicitation of kickbacks. Second, Meister exercised poor judgment in allowing Merker's promotion to become effective after learning of Merker's attempt to solicit kickbacks and further keeping quiet after learning of Merker's conflict of interest with Capitol. As to these first two bases for his dismissal, Meister has no response. He does not dispute that he waited months before revealing his suspicions or the findings of his investigation. Finally, according to G–P and Mail–Well, Meister mismanaged the shipping function by insisting Mail–Well use Capitol when it was overcharging Mail–Well for carrying freight.

With respect to Swartz's termination, G–P and Mail–Well offer equally legitimate justifications. Primarily at issue was his relationship with the vendors, such as Peluso from Capitol, who paid for weekly lunches with Swartz for several years. He also introduced Merker to Peluso and, according to Sparks, he arranged for and was present during the dinner in which Peluso and Merker settled the horse transaction. Swartz also admitted that he had discussed the progress of the confidential investigation into the alleged kickback scheme with Peluso and with Porento of Best Cutting Die Company.

Meister and Swartz argue that these purported justifications for their dismissals are pretextual. Under Illinois law, a pretext has been defined as "a purpose or motive alleged or an appearance assumed in order to cloak the real information or state of affairs." *Marin,* 149 Ill.Dec. at 821, 562 N.E.2d at 285 (quoting *Wayne v. Exxon Coal USA, Inc.,* 157 Ill.App.3d 514, 109 Ill.Dec. 600, 603, 510 N.E.2d 468, 471 (1987)). To establish that their employer's purported reasons are no more than a pretext, Meister and Swartz must show either that a retaliatory animus more likely motivated their employer, or that their employer's proffered explanations are unworthy of credence. *Hiatt,* 26 F.3d at 768; *Robinson,* 23 F.3d at 1163. Plaintiffs make no attempt to establish that their termination was more likely motivated by a desire to retaliate against them for reporting the alleged kickback scheme. Instead, they contend that the stated justifications were unworthy of credence.

Meister's primary attack is on the conclusions of the investigators and auditors that he mismanaged the shipping department at Chicago's Mail–Well plant. He asserts that the auditors were inexperienced and unqualified and their conclusions actually bolstered his position that in the one area in which he negotiated rates, less-than-truckload shipments, the rates were found to be favorable. He also alleges that the audits made unfair comparisons with rates and methods unavailable to him. These assertions, however, are not sufficient to establish pretext. "There is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Schultz v. General Electric Capital Corp.,* 37 F.3d 329, 334 (7th Cir.1994) (quoting *Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994)). Meister's assertions address the second concern while his burden is to prove the former. Any study on

the availability of better rates can be challenged on the grounds that it is comparing apples with oranges.[9] There is no allegation that any of the investigators knew the data to be inaccurate ·or unreliable. G–P and Mail–Well's multiple reviews and comparisons of the data by Burman, Blasingame, Witmer, and Willis belies any notion that their decision is unworthy of credence.

Moreover, Meister makes little attempt to establish that the other explanations were pretextual. He does not dispute that he failed to report his knowledge of Merker's alleged solicitation of a kickback and allowed Merker's promotion ·to proceed. He also failed to report his own findings that Merker may have had a conflict of interest with Capitol. Meister's only response is that he did not feel he had enough evidence to report the allegations until Swartz reported Merker's alleged extortion attempt. However, senior management is entitled to find it an exercise of poor judgment not to report his suspicions and findings immediately. G–P and Mail–Well may have concluded that it makes good business sense to demand the immediate report of any such allegations, rather than suffering for months under the potentially higher rates engendered by kickbacks before acting. We do "not sit as a super-personnel department that re-examines an entity's business decisions." *Roger,* 21 F.3d at 151.

Swartz makes even less of an attempt to establish that the reasons for his dismissal were a pretext. He admits his relationship with Peluso and Porento, admits that the two vendors often asked about the investigation, but denies that he ever revealed confidential information. An employee's "own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination." *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1303 (7th Cir.1991). Blasingame, Witmer, Sparks and Slattery each concluded from their respective interviews that the vendors knew information about the investigation that had only been

---

9. For example, Meister continually points to the fact that Chicago's Mail–Well plant had the fourth lowest shipping costs among Mail–Well plants, but he never points out how this establishes that the rates were as low as they could be. Chicago might provide a more competitive market for shippers or Chicago's Mail–Well plant may be large enough to secure volume discounts.

shared with Swartz. Swartz does not allege that Blasingame and Witmer from G–P's internal audit department in Georgia, and Sparks and Slattery from Butler and Mail–Well headquarters in Colorado collectively contrived this explanation.

In conclusion, the number of investigations and their intensity supports G–P and Mail–Well's contention that upper management had little reason to retaliate against the provision of this kind of information. Kickbacks and conflicts of interest may allow vendors to charge above-market rates and result in lower overall profits for the buyer. Even after Foster concluded there was no evidence of a kickback, G–P's Code of Conduct Committee ordered members of its internal audit department to investigate the possibility that a conflict of interest may have resulted in increased costs for G–P. Consistent with an interest to ferret out such costly and compromising situations, G–P and Mail–Well fired Merker and discontinued using Capitol in direct response to the plaintiffs' allegations. Thus, the plaintiffs have simply failed to provide any evidence of a retaliatory motive on the part of G–P and Mail–Well's senior management.

### III.

For the reasons set forth above, we accordingly AFFIRM the decision of the district court.